1    CHRISTOPHER L. BLANK (SBN 115450)
     CHRISTOPHER L. BLANK, ATTORNEY AT LAW, PC
2    2973 Harbor Blvd. #506
     Costa Mesa, CA 92626
3    Telephone:    (949) 250-4600
     Email:    chris@chrisblanklaw.com
4
5    Attorney for Appellant Jamie Lynn Gallian

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   In Re                              )
                                        )**District Court Case No.**
12                                      )
     JAMIE LYNN GALLIAN                 )**8:25-cv-00827-CV**
13                                      )
                                        )**Bankruptcy Court Case No.**
14              Debtor.                 )
                                        )**8:21-bk-11710-SC**
15   ─────────────────────────         )
                                        )**APPELLANT'S OPENING BRIEF**
16   JAMIE LYNN GALLIAN, Appellant      )
                                        )
17   vs.                               )
                                        )
18   JEFFREY GOLDEN, TRUSTEE, Appellee  )
                                        )
19                                      )
                                        )
20   ─────────────────────────         )

21

22

23

24

25

26

27

28

APPELLANTS' OPENING BRIEF

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.      INTRODUCTION..................................................................................2

II.    QUESTIONS PRESENTED ..................................................................3

III.   STANDARD OF REVIEW ....................................................................4

IV.    ARGUMENT .........................................................................................5

  A.   Blind Justice and the Rule of Law..................................................5

  B.   Winning Bidder Peplin Disqualified Himself as a Good Faith Purchaser When He Hired Stalking Horse Bidder Galaxy as his Broker, Preventing Galaxy from Bidding Competitively Against Him. ..................................................7

  C.   J-Pad Lent No Money to J-Sandcastle or Anyone Else.  Therefore, J-Pad was Owed No Money from the Sale of Gallian's Home.  The Money Presently Held by the Trustee from the Sale of Gallian's Home Derived Solely from her Exempt Interest in Her Home...................................................................................10

  D.   The Judgement in the J-Pad Adversary Action Did NOT Determine that the J-Pad Lien was Valid or Valuable, and Gallian did NOT Collaterally Attack that Judgment. .................................................................................15

  E.   California Law Prohibits Golden's Sale of Jamie Gallian's Home for Less than the Amount of her $600,000 Homestead Exemption. ....................................17

  F.   Gallian's Exempt Interest in the Property is not Property of the Estate and Cannot be Sold by Golden................................................................20

  G.   Bankruptcy Law Prohibits Golden's Sale of the Property Free and Clear of Gallian's Exempt Interest in the Property Without Her Consent. ..............................21

V.     CONCLUSION .................................................................................23

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Amin v. Khazindar*, 112 Cal. App.4th 582, 588 (Cal. Ct. App. 2003) ...............................17

4

*Connelly v. Marine Midland Bank, N.A.*, 61 B.R. 748 (W.D.N.Y. 1986) ......................13

5

*Crosby v. Mills*, 413 F.2d 1273 (10th Cir. 1969).................................................16

6

*In re Appalachian Energy Indus., Inc.,* 25 B.R. 515 (Bankr. M.D. Tenn. 1982) ...........12

7

*In re Copper King Inn, Inc.*, 918 F.2d 1404, 1407 (9th Cir. 1990)...................................5

8

*In re Diaz*, 547 B.R. 329,334 (B.A.P. 9th Cir. 2016) ......................................18

9

*In re Diener,* 483 B.R. 196, 203 (9th Cir. B.A.P. 2012) .......................................19

10

*In re Gilman*, 608 B.R. 714, 722 (Bankr. C.D. Cal. 2019) ..............................18

11

*In re Hyman,* 967 F.2d 1316, 1318–19 (9th Cir. 1992) .....................................21

12

*In re Roach*, No. 8:17-BK-12091-TA, 2019 WL 408628 (B.A.P. 9th Cir. Jan. 29, 2019)..............11

13

*In re Rubin*, 875 F.2d 755, 758 (9th Cir. 1989) ...................................................4

14

*In re Tallerico*, 532 B.R. 774, 780 (Bankr. E.D. Cal. 2015)........................................17

15

*In re Tri-Sonic, Inc.*, 1 B.R. 138 (Bankr. N.D. Tex. 1979) ................................13

16

*In re Van de Kamp's Dutch Bakeries*, 908 F.2d 517 (9th Cir. 1990).....................11, 12

17

*Rai v. Henderson (In re VCR1, LLC)*, 789 Fed. Appy. 992, 996 (5th Cir. 2019) ...................10

18

*Thomas v. Namba (In re Thomas)*, 287 B.R. 782,785 (9th Cir. BAP 2002)..................4, 8

19

*Timmsen v. Forest E. Olson, Inc.*, 6 Cal.App.3d 860 (1970)............................................9

20

*Uriostegui v. Dowling (In re Uriostegui),* 669 B.R. 49 (B.A.P. 9th Cir. 2025) ..................7

21

**Statutes**

22

11 U.S.C. Section 363(f)..................................................................................22

23

Bankruptcy Code Section 363 ........................................................................6

24

Bankruptcy Code Section 522 .....................................................................6, 17

25

Cal. Civ. Proc. Code § 701.620 ....................................................................20

26

Cal. Civ. Proc. Code § 704.730 ....................................................................19

27

Cal. Civ. Proc. Code § 704.740 ....................................................................20

28

ii

Cal. Civ. Proc. Code § 704.800 ........................................................................ 19

Cal. Civ. Proc. Code § 704.910 - § 704.995 ................................................... 17

Cal. Civ. Proc. Code §704.910(c) ................................................................... 18

Cal. Civ. Proc. Code§ 703.130 ....................................................................... 17

Cal. Civ. Proc. Code§ 704.710 - §704.850 .................................................... 18

Cal. Civ. Proc. Code§ 704.710 et seq ............................................................ 18

Cal. Civ. Proc. Code§ 704.720 ................................................................. 18, 19

Cal. Com. Code § 9203 .................................................................................... 14

iii

## I.      **INTRODUCTION**

In 2018, Jamie Gallian was living in a condo in Huntington Beach, California.  That year she sold the condo and used the proceeds to purchase a manufactured home located at 16222 Monterey Lane, Space 376, Huntington Beach, California Decal No. LBM1081 ("Jamie's Home" or the "Property").  She lived in the Property from the time she purchased it until a little more than two months ago.  She was forced to move out the first week of May 2025 after the Bankruptcy Court granted Trustee Jeff Golden's motions to sell her home and kick her out of it.  The Bankruptcy Court granted the Trustee's motions even though Gallian's bankruptcy estate had no non-exempt equity in the Property for the Trustee to sell.  The Court granted Golden's motions even though Gallian had an unassailable $600,000.00 automatic exemption in the Property ("Gallian's Exempt Interest") established by a Final Non-Appealable Order of the Bankruptcy Court entered May 17, 2024. [Docket 394].  The Bankruptcy Court granted Golden's Motion to Sell over Gallian's strenuous opposition and without her consent.

Trustee Golden sold Gallian's home for a total price of $276,000.00 to Greg Peplin. The Bankruptcy Court determined that Peplin made the purchase in good faith.  The Bankruptcy Court ordered the net proceeds of the sale to be paid to Trustee Golden.  The Bankruptcy Court denied Gallian's Motion for Stay Pending Appeal.  The Bankruptcy Court also entered Supplemental Orders requested by Golden regarding Gallian's eviction and sale of her home -- without giving Gallian an opportunity to be heard with respect to those Supplemental Orders.  By this Appeal, Gallian seeks reversal of the Bankruptcy Court's decisions.

How did this happen?  It happened because Golden asserted that he held a valuable lien against Gallian's home – the J-Pad Lien.  Golden argued that the bankruptcy estate would benefit if he were allowed to sell Gallian's home to realize the value of the J-Pad Lien.  The Bankruptcy Court accepted this argument and allowed Golden to sell the Property, despite the admitted absence of *non-exempt equity* in the Property.  That was legal error, reviewable de novo, which must be reversed.  It was also legal error, reviewable de novo, for the Bankruptcy Court to hold that the J-Pad lien had value in the hands of Trustee Golden.  State law governs the attachment, perfection and validity of liens in bankruptcy and the J-Pad lien never attached and was not

1    entitled to payment under California law.  This is another reason the Bankruptcy Court's order

2    authorizing the sale must be reversed.

3         The Bankruptcy Court's determination that the sale to Peplin was entitled to good faith

4    protection was based on an erroneous factual determination as well as an erroneous legal

5    determination.  The factual determination is reviewed for clear error.  The legal determination is

6    reviewed de novo.  Both errors require reversal of the Court's approval of the sale of Gallian's

7    home.

8         Because Trustee Golden had no right to sell Gallian's home, it was legal error, reviewable

9    de novo, for the Bankruptcy Court to order her to leave her home.  That order must be reversed as

10   well.

11   **II.    <u>QUESTIONS PRESENTED</u>**

12        1.    Did the Court err in granting the Trustee's Motion for Approval of Sale of the

13   Debtor's Homestead Dwelling?

14        2.    Did the Court err in granting the Trustee's Motion for Turnover of the Debtor's

15   Homestead Dwelling?

16        3.    Did the Court err in determining the Buyer of the Debtor's Homestead Dwelling

17   was a good faith purchaser pursuant to 11 U.S.C. Section 363(m).

18        4.    Did the Court err by ignoring its numerous prior rulings that J-Pad did not lend any

19   money to J-Sandcastle and therefore was owed no money by J-Sandcastle?

20        5.    Did the Court err in determining that the Trustee was entitled to collect anything on

21   the J-Pad Lien?

22        6.    Did the Court err in determining that the J-Pad Lien was valid and enforceable

23   against the Debtor's Homestead Dwelling?

24        7.    Did the Court err in determining that the Trustee may sell the Debtor's Homestead

25   Dwelling even though there was no non-exempt equity in the Property?

26        8.    Did the Court err in dismissing or ignoring the Debtor's argument that her exempt

27   interest in the property includes her right to continued possession of the property, and that right is

28   not property of the estate and may not be sold by the Trustee?

9.     Did the Court err in failing and refusing to apply California exemption law to the sale of the Debtor's Homestead Dwelling by allowing the Trustee to sell the Property even though the sale did not generate sufficient proceeds to satisfy the entirety of the Debtor's exemption in her equitable interest in the Property?

10.     Did the Court err in allowing the Trustee to sell the Property free and clear of the Debtor's exempt equitable interest in the Property in violation of 11 U.S.C. Section 363(f)?

11.     Did the Court err in dismissing or ignoring the Debtor's arguments on the grounds that her arguments were an improper collateral attack on the Court's previous Judgment in Adversary Action 8:23-ap-1064-SC?

12.     Did the Court err in denying the Debtor's Motion for Stay Pending Appeal?

13.     Did the Court err in determining that Gallian had a low likelihood of prevailing on appeal?

14.     Did the Court err in determining that the harm to the Trustee in staying the Court's orders outweighed the irreparable harm caused to Debtor by denying her Motion for Stay Pending Appeal?

15.     Did the Court err in issuing its Supplemental Orders [Docket 598 and 599] based solely on the Declaration of Eric Israeal [Docket 597] without giving the Debtor an opportunity to respond to that Declaration or an opportunity to be heard on the propriety of the Supplemental Orders sought by the Trustee?

16.     Did the Court err in basing its decisions and orders on evidence and authorities that were not included in the Trustee's moving documents or replies, and without giving the Debtor an opportunity to be heard with respect to that extraneous evidence and authorities?

## III.   <u>STANDARD OF REVIEW</u>

The Bankruptcy Court's findings of fact are reviewed for clear error. The Bankruptcy Court's legal conclusions are reviewed de novo. *In re Rubin*, 875 F.2d 755, 758 (9th Cir. 1989). A determination that a purchaser of property from a bankruptcy estate acted in good faith is reviewed for clear error. *Thomas v. Namba (In re Thomas)*, 287 B.R. 782,785 (9th Cir. BAP 2002). Issues regarding application of Title 11 are governed by Federal law. "State law controls the

1    validity and effect of liens in the bankruptcy context. *In re Loretto Winery Ltd.,* 898 F.2d 715, 718

2    (9th Cir.1990); *In re Wind Power Systems, Inc.,* 841 F.2d 288, 293 (9th Cir.1988); *In re Southland*

3    *Supply, Inc.,* 657 F.2d 1076, 1080 n. 6 (9th Cir.1981)." *In re Copper King Inn, Inc.*, 918 F.2d

4    1404, 1407 (9th Cir. 1990)

5    **IV.    ARGUMENT**

6          **A.    Blind Justice and the Rule of Law.**

7          The Bankruptcy Court's order granting Trustee Golden's motions to sell and evict

8    Gallian from her home [Appendix ER 762 – 787] includes a three-and-a-half-page section entitled

9    "General Relevant Background." [ER 767 – 770].  That section begins with the question "Who is

10   this Debtor?"  That section delves into various aspects of Gallian's Bankruptcy Case that were not

11   put into evidence by the Trustee in his moving papers.  Gallian had no opportunity to be heard

12   regarding the relevance or significance of the Bankruptcy Court's impressions of "*who she is*."

13   More importantly, "*who she is*" is irrelevant to whether Golden had a right to sell Gallian's home.

14   "*Who she is*" is irrelevant to Gallian's right to continued possession of her home.  "*Who she is*" is

15   irrelevant to the validity of Gallian's homestead exemption and her right to prevent a sale of her

16   home for less than would be required to pay her the $600,000.00 value of that exemption.

17         When Gallian purchased her home for cash in 2018, she titled it in the name of her

18   wholly owned entity known as J-Sandcastle LLC.  At the same time, she recorded documents

19   indicating that another wholly owned entity, J-Pad LLC, had a lien on the Property, initially in the

20   amount of $175,000.00, subsequently increased to $225,000.00 – the J-Pad Lien.  In February of

21   2021, several months before filing her bankruptcy petition, Gallian filed documents with the

22   California Department of Housing and Community Development, ("HCD") to put title to the

23   Property into her own name.  Immediately before she filed her bankruptcy petition, she also filed

24   papers with the HCD and to release the J-Pad Lien.  Despite these efforts, in the midst of COVID

25   19, HCD did not record the documents until several days after Gallian filed her bankruptcy in July

26   of 2021.  As a result, when Gallian filed her bankruptcy petition, she did not hold record title to

27   her home and J-Pad still appeared as a legal owner (lien holder) on her home.  See, *Declaration of*

28   *Jamie Gallian in support of her Omnibus Opposition to Sell and for Turnover of Property.*

1  [Docket 554, at 19 – 21, and **Exhibit 102** at 31 – 48; ER 311 – 312 and 323 – 340].

2  These title issues led to a fight over Gallian's right to a homestead exemption.

3  Gallian's exemption was hotly contested by creditor Houser Bros. ("Houser"), but not Trustee

4  Golden.  Gallian won that fight in front of Bankruptcy Judge Erithe Smith, as a *pro per* litigant,

5  despite two appeals filed by Houser Bros.  Judge Smith subsequently retired, and the case was

6  assigned to Judge Clarkson.  However, by the time Golden filed his Motion to sell Gallian's home,

7  Gallian's $600,000.00 exemption in her home was undisputed.  [ER 294 at lines 4 – 7 referencing

8  Judge Smith's Final Non-Appealable Order entered May 17, 2024 [Docket 394].  The Trustee did

9  not dispute Gallian's $600,000.00 Exempt Interest in her home.

10  The title issues also led Houser Bros. to file an adversary action contesting

11  Gallian's right to a bankruptcy discharge.  Houser Bros. won that fight before Judge Clarkson.

12  Judge Clarkson denied Gallian a discharge, finding that she had fraudulently tried to conceal her

13  interest in the Property by titling it in J-Sandcastle and recording a lien against it in favor of J-Pad.

14  However, Judge Clarkson's findings in the discharge action are irrelevant to Trustee Golden's

15  motion to sell Gallian's home.

16  Bankruptcy Code Section 363, which governs sales of estate property, does not

17  refer to a Debtor's discharge or denial of discharge as a basis for approving a trustee's sale.

18  Bankruptcy Code Section 522, which governs a debtor's exemption rights, does not refer to a

19  Debtor's discharge or denial of discharge as affecting a debtor's entitlement to claim exemptions.

20  However, Section 522 includes a subsection (q)(1).  That subsection limits a debtor's homestead

21  exemption if:

22  (A) the court determines, after notice and a hearing, that the debtor has been

23  convicted of a felony (as defined in section 3156 of title 18), which under

24  the circumstances, demonstrates that the filing of the case was an abuse of

25  the provisions of this title; or

26  (B) the debtor owes a debt arising from--

27  (i) any violation of the Federal securities laws (as defined in section

28  3(a)(47) of the Securities Exchange Act of 1934), any State

6

1   securities laws, or any regulation or order issued under Federal

2   securities laws or State securities laws;

3   (ii) fraud, deceit, or manipulation in a fiduciary capacity or in

4   connection with the purchase or sale of any security registered under

5   section 12 or 15(d) of the Securities Exchange Act of 1934 or under

6   section 6 of the Securities Act of 1933;

7   (iii) any civil remedy under section 1964 of title 18; or

8   (iv) any criminal act, intentional tort, or willful or reckless

9   misconduct that caused serious physical injury or death to another

10   individual in the preceding 5 years.

11   The Ninth Circuit Bankruptcy Appellate Panel recently addressed Subsection (q)

12   and held that: "Rather than limiting state law exemptions in every bankruptcy case involving

13   nondischargeable debts, Congress designated a narrow set of circumstances that trigger the

14   limitation." *Uriostegui v. Dowling (In re Uriostegui),* 669 B.R. 49 (B.A.P. 9th Cir. 2025).

15   In our case, no one alleged, and the Bankruptcy Court did not find, Gallian has

16   been convicted of any felony.  No one alleged, and the Bankruptcy Court did not find, that Gallian

17   owes any debts described in subsection (q)(1)(B).  It was improper for the Bankruptcy Court to

18   ignore Gallian's exemption rights or decide that her home could be sold in derogation of the

19   requirements of 11 U.S.C. Section 363 based on its denial of her discharge.

20   Justice wears a blindfold for a reason.  The law must be applied fairly, without

21   regard for any personal animosity a judge may bear toward a particular party.  "*Who the debtor*

22   *is*", does not justify ignoring the law.  "*Who the debtor is*", does not justify imposing an

23   idiosyncratic notion of fairness.  The Rule of Law is under attack in the United States.  Now more

24   than ever it is important for judges to faithfully determine facts and faithfully follow the law.

25   When they do, justice will be done.

26   **B.    Winning Bidder Peplin Disqualified Himself as a Good Faith Purchaser When**

27   **He Hired Stalking Horse Bidder Galaxy as his Broker, Preventing Galaxy**

28   **from Bidding Competitively Against Him.**

APPELLANTS' OPENING BRIEF

1    The Bankruptcy Court held Buyer Peplin to be a "Good-Faith Purchaser under

2    Section 363(m).  [Docket 593, at 15 line 21 – 24 line 26; ER 776 – 785].  The holding is

3    significant because if upheld, the sale to Peplin cannot be undone even if the order approving the

4    sale was erroneous.  Gallian sought a stay of the orders allowing Trustee Golden to sell her home

5    and kick her out of it from the Bankruptcy Court.  Her request was denied. [Docket 594; ER 788 –

6    802].  A determination that a purchaser of property from a bankruptcy estate acted in good faith is

7    reviewed for clear error. *Thomas v. Namba (In re Thomas)*, 287 B.R. 782,785 (9th Cir. BAP 2002).

8    However, when the lower court has clearly erred in that determination, an erroneously approved

9    sale must be undone and the parties restored to the status quo ante.  The Bankruptcy Court in this

10   case clearly erred in determining that Peplin was a good-faith purchaser.

11       The Bankruptcy Court invested pages of its orders explaining the law pertaining to

12   Section 363(m), but ignored the most salient **undisputed** fact that demonstrated a lack of good-

13   faith.  Peplin admittedly hired the competing stalking horse bidder, Galaxy Homes, to represent

14   him as his broker in his efforts to purchase Gallian's Home.  When Peplin hired Galaxy Homes to

15   represent him as a potential buyer of the Property, Galaxy Homes took on a fiduciary duty to

16   refrain from harming him in that endeavor.  When the broker hired by the overbidder is also itself

17   the stalking horse bidder and the only other potential bidder for the property, the overbidder has

18   effectively ended the competitive bidding process.  This is antithetical to the objectives of a

19   bankruptcy trustee's sale of estate property.  The stalking horse bidder/broker can no longer bid up

20   the price, not because of dual representation, but because the stalking horse bidder/broker

21   *represents the overbidder*.  If Galaxy had continued bidding up the price on its own behalf, that

22   would have absolutely harmed its client, Peplin.  To do so would have been a breach of Galaxy's

23   fiduciary duty.

24       "A California real estate broker has a fiduciary duty to their client, which

25          includes the obligation of utmost care, integrity, honesty, and loyalty in

26          dealings with the client. *Lazar v. Bishop*, 107 Cal.App.5th 668 (2024)). This

27          fiduciary duty precludes the broker from assuming a position adverse to that

28          of their principal unless the principal consents. *Timmsen v. Forest E. Olson,*

8

1    *Inc.*, 6 Cal.App.3d 860 (1970). Specifically, a broker representing a seller

2    may breach their duty of honesty and fair dealing by secretly competing

3    with the purchaser. *Nguyen v. Scott*, 206 Cal.App.3d 725 (1988). This duty

4    of loyalty and undivided service means that the broker must act in the

5    highest good faith towards their principal and disclose all material facts

6    concerning the transaction that might affect the principal's

7    decision. *Jorgensen v. Beach 'N' Bay Realty, Inc.*, 125 Cal.App.3d 155

8    (1981), *Montoya v. McLeod*, 176 Cal.App.3d 57 (1985). Therefore, a real

9    estate broker in California has a fiduciary duty not to bid against their

10    client, as doing so would constitute a position adverse to the client's

11    interests and could be seen as a breach of the duty of loyalty and good

12    faith."

13    *Timmsen*.

14    At the hearing on April 10, 2025 the Court asked: "Did Galaxy breach its fiduciary

15    duty?"  The pertinent question was not whether Galaxy had breached its fiduciary duty to Trustee

16    or the estate.  Galaxy had no fiduciary duty to the Trustee or the estate.  However, by agreeing to

17    represent Peplin, the overbidder, Galaxy took on a fiduciary duty to him.  The pertinent question

18    was whether Peplin was entitled to a good faith finding when Peplin had precluded any further

19    competitive bidding for the Property by hiring the competing bidder to be his broker.  By hiring

20    Galaxy to be his broker, he obligated Galaxy to refrain from doing anything to harm his interest in

21    purchasing the property for the least amount possible.  By hiring the competing bidder as his

22    broker, Peplin effectively chilled bidding for the Property and disqualified himself as a good faith

23    buyer.

24    When a prospective purchaser short circuits the competitive bidding process by

25    hiring the only other bidder to be his broker, the goal of the Bankruptcy Code -- to maximize the

26    benefit to the bankruptcy estate -- is thwarted.  That problem wasn't fixed by the buyer switching

27    brokers after the deed was done.  That problem wasn't fixed by redoing the auction, particularly

28    because Galaxy did not attend or participate in the second auction.  That problem wasn't fixed by

APPELLANTS' OPENING BRIEF

1   conducting an evidentiary hearing after Galaxy chose not to rejoin the bidding process.  That

2   problem wasn't fixed when no evidence was submitted that showed Galaxy was relieved of its

3   fiduciary duty to refrain from harming Peplin.

4            Instead of wrestling with and recognizing the problem created when an overbidder

5   hires the stalking horse bidder to be his broker, the Bankruptcy Court cited a 5th Circuit case for

6   the proposition that a broker may represent two competing bidders in a bankruptcy sale without

7   impugning the integrity of the sale.  *Rai v. Henderson (In re VCR1, LLC)*, 789 Fed. Appy. 992,

8   996 (5th Cir. 2019).  [ER 784, 785].  That case was not cited by the Trustee or Houser in their

9   moving papers, replies or subsequent filings.  Gallian was not offered the opportunity to address it

10  and explain why it was not controlling.  It is not controlling because a single broker representing

11  two potential purchasers does not necessarily create a bad faith situation because both purchasers

12  are still free to compete with one another.  The objectives of a bankruptcy trustee's sale of estate

13  property are not impaired.  However, when the broker is itself the competing bidder, the situation

14  is different.

15           The Bankruptcy Court clearly erred in finding that Peplin was a good faith

16  purchaser.  It's error was not based on conflicting testimony or the credibility of witnesses.  It was

17  based on the Bankruptcy Court's choice to ignore the undisputed facts.  That error must be

18  reversed.  Peplin's purchase should not be immune from being set aside pursuant to 11 U.S.C.

19  Section 363(m).  Judge Clarkson's rather transparent efforts to protect himself from reversal by

20  conducting two pointless proceedings, after failing to recognize the problem inherent in a bidder

21  squelching a fair and robust auction by hiring a competing bidder to represent him as his broker,

22  should not be countenanced.

23       **C.    J-Pad Lent No Money to J-Sandcastle or Anyone Else.  Therefore, J-Pad was**

24       **Owed No Money from the Sale of Gallian's Home.  The Money Presently Held**

25       **by the Trustee from the Sale of Gallian's Home Derived Solely from her**

26       **Exempt Interest in Her Home.**

27           Trustee Golden justified his motion to sell Gallian's Home by arguing he held a

28  valuable lien against Gallian's home – the J-Pad Lien.  Golden argued that the bankruptcy estate

1    would benefit if he were allowed to sell Gallian's home to realize the value of the J-Pad Lien.  The

2    Bankruptcy Court accepted this argument and allowed Golden to sell the Property, despite the

3    admitted absence of *non-exempt equity* in the Property.  Even if this Court is not inclined to undo

4    the sale of Gallian's home, she is still entitled to the proceeds of the sale and that issue is not

5    precluded by Section 363(m) or otherwise moot.

6            The sale proceeds presently sitting in the Trustee's bank account are NOT proceeds

7    of any debt owed to J-Pad as holder of a lien against Gallian's home.  This is indisputable because

8    it is indisputable that no debt was ever owed to J-Pad.  The sale proceeds sitting in the Trustee's

9    bank account are entirely proceeds of the sale of Gallian's Exempt Interest in her homestead.  The

10   Trustee had no right to sell her homestead to generate those proceeds, and the entirety of those

11   proceeds are exempt and belong to Gallian.

12           In Golden's Motions, to satisfy his burden of showing a business justification for

13   selling the Property, he argued that the sale would generate $256,000 or more in proceeds payable

14   on the J-Pad lien for the benefit of the bankruptcy estate.  Golden cited the unpublished decision

15   of *In re Roach*, No. 8:17-BK-12091-TA, 2019 WL 408628 (B.A.P. 9th Cir. Jan. 29, 2019) in

16   support of his assertion that a debtor's homestead can be sold without deference to the debtor's

17   exemption as long as the bankruptcy estate will benefit from the sale.  Golden overstated the

18   holding of *Roach*.  By the time the *Roach* case got to the B.A.P. the subject property had been sold

19   to a good faith buyer.  The debtor had not sought or received a stay of the sale and therefore the

20   propriety of the sale was no longer contestable.  The B.A.P. decision only addressed the debtor's

21   right to impose her exemption on the proceeds of the sale that were split between a secured

22   creditor and the bankruptcy estate pursuant to a settlement agreement that had been approved by

23   the Bankruptcy Court and was final and non-appealable.  The B.A.P. decided her exemption rights

24   did not attach to those proceeds.  *Roach* does not govern the present case because Peplin was not a

25   good faith purchaser, and more importantly, the J-Pad lien did not attach to the Property and did

26   not secured a valid debt.

27           Golden also cited *In re Van de Kamp's Dutch Bakeries*, 908 F.2d 517 (9th Cir.

28   1990) in support of this argument.  Both *Roach* and *Van de Kamp* are distinguishable.  In *Roach*,

APPELLANTS' OPENING BRIEF

1    the secured interest in the debtor's property was not disputed.  The issue resolved by the B.A.P.

2    was the debtor's claim that her homestead exemption should be paid from the proceeds

3    attributable to the secured interest that had been shared with the Trustee.  In *Van de Kamp*, the

4    fight involved the priority of two different liens that were avoided by the Trustee.  One lien was

5    for unpaid benefit contributions owed to the unions that represented the employees of the bakery

6    business.  The other lien was a consensual lien involving the President of the company.  The

7    unions argued that outside of bankruptcy, their lien would have priority over the President's lien.

8    The Court determined that because the Trustee had avoided and preserved the President's lien,

9    which on its face had priority over the unions' lien, the preserved President's lien maintained its

10   priority over the unions lien.

11                    Appellants do not dispute that the avoided interest was properly perfected

12                    prior in time to the asserted perfection of their lien. Under Washington law,

13                    a fraudulent conveyance is good as between the parties and passes title.

14                    *Preston–Parton Milling Co. v. Dexter Horton & Co.,* 22 Wash. 236, 60 P.

15                    412 (1900). Appellants could have brought an action in state court prior to

16                    the commencement of the bankruptcy action to avoid the fraudulent transfer

17                    but chose not to do so. Now they ask this court to determine how such an

18                    action would have concluded, and to grant them a status they might have

19                    attained absent the bankruptcy proceedings. This we cannot do.

20   *In re Van de Kamp's Dutch Bakeries*, 908 F.2d 517, 519 (9th Cir. 1990).

21                    When a Trustee avoids and preserves an interest in property, the Trustee "steps into

22   the shoes" of the party whose interest was avoided and preserved.  The effect of preserving an

23   interest, does not enhance the interest.  The Trustee enjoys no better rights in the asset preserved

24   than did the original holder of those rights.  See, *In re Appalachian Energy Indus., Inc.,* 25 B.R.

25   515 (Bankr. M.D. Tenn. 1982) (in avoiding the unperfected lien of the seller, the trustee preserved

26   only such rights as the seller possessed in the collateral, and on the facts presented, the only right

27   the seller acquired in the forklift, and thus the only right preserved for the benefit of the estate, was

28   a security interest junior to the bank's properly perfected security interest), *In re Tri-Sonic, Inc.,* 1

12

B.R. 138 (Bankr. N.D. Tex. 1979) (preservation would not enhance status of trustee's lien so that if it would have been defeated by junior claimants while in hands of the original lienholder it was also vulnerable in trustee's hands), *Matter of Woodworks Contemp. Furniture, Inc.*, 44 B.R. 971 (Bankr. W.D. Wis. 1984) (however substantial are powers of trustee to preserve avoided lien free of technical defects, when lien by its very nature is not securing purchase money, lien cannot be reinvented as one securing purchase money loan), *Connelly v. Marine Midland Bank, N.A.*, 61 B.R. 748 (W.D.N.Y. 1986) (trustee, upon avoiding creditor's first-in-time but unperfected security interest, stepped into creditor's shoes as to its unperfected security interest, and thus, bank's perfected security interest had priority over trustee's unperfected security interest under New York law).

Our case does not involve a question of priority. Our case involves the validity and value of the J-Pad lien itself. In his Motion to Approve Sale, Golden failed to address California law regarding the validity, creation and satisfaction of liens and security interests. Rather, Golden asserted that the J-Pad Lien he avoided and preserved was based on a 2019 Note and Security Agreement indicating that J-Pad was owed $225,000.00 plus interest at the rate of 5.5%. No such Note and Security Agreement were attached as exhibits to Golden's Motion. Golden attached a copy of the Default Judgment Avoiding the J-Pad lien to his Motion as part of **Exhibit 7** [Docket 539-1, pages 32 – 24; ER 157 - 160]. Notably, it references various documents purporting to perfect the J-Pad lien, but does not include a copy of any Note or Security Agreement. A true and correct copy of the Complaint in Avoidance Adversary Action, Case No. 8:23-ap-01064-SC, is attached Gallian's Omnibus Opposition as **Exhibit 102**. [ER 323 – 340]. Notably that complaint also fails to attach a copy of any Note or Security Agreement.

More importantly, in Paragraphs 30 and 31 of the Complaint in the J-Pad Adversary Action, Golden alleges that:

> 30. Notwithstanding that the secured promissory notes were for $225,000, J-Sandcastle did not advance or loan any money to J-Pad at any point in time. The Debtor, however, advanced $175,000 to J-Pad at about the time of the First J-Pad Transfer, with the balance of $50,000 coming

1    from the Debtor later (collectively, the "Third J-Pad Transfer").

2    　31. Despite the two secured promissory notes, the $225,000 was not

3    owed to J-Pad. Rather, the $225,000 was owed by J-Pad to the Debtor (who

4    had in fact advanced the funds from her personal accounts).

5    **Exhibit 102**, at 6, lines 5 – 11.  These allegations were repeated in Golden's Motion for Default

6    Judgment against J-Pad and were the heart of Golden's argument for avoiding the J-Pad lien as a

7    fraudulent transfer [Docket 76 in the J-Pad Adversary Action].  That is, Golden alleged and

8    proved that no money was ever lent by J-Pad to J-Sandcastle, and no debt was ever owed by J-

9    Sandcastle to J-Pad.  Gallian agrees that J-Pad did not lend any money to anyone and is not owed

10   any money.

11   　Section 9203 of the California Commercial Code provides that:

12   　(a) A security interest attaches to collateral when it becomes enforceable

13   　against the debtor with respect to the collateral, unless an agreement

14   　expressly postpones the time of attachment.

15   　(b) Except as otherwise provided in subdivisions (c) to (i), inclusive, a

16   　security interest is enforceable against the debtor and third parties with

17   　respect to the collateral only if each of the following conditions is satisfied:

18   　(1) Value has been given.

19   　(2) The debtor has rights in the collateral or the power to transfer rights in

20   　the collateral to a secured party.

21   　(3) One of the following conditions is met:

22   　(A) The debtor has signed a security agreement that provides a description

23   　of the collateral and, if the security interest covers timber to be cut, a

24   　description of the land concerned.

25   　* * *

26   Cal. Com. Code § 9203 (West).

27   　According to the allegations and proof submitted by Golden in the J-Pad Adversary

28   Action, J-Pad gave no value in return for any security interest it was granted in the Property by J-

14                                                    APPELLANTS' OPENING BRIEF

Sandcastle.  Golden also failed to submit any evidence that J-Sandcastle ever signed a security agreement providing a security interest in the Property to J-Pad or executed a Note in favor of J-Pad.  As a result, no security interest ever attached to the Property in favor of J-Pad and no debt is owed to J-Pad.  The Complaint in the J-Pad Adversary Action also alleges that on July 9, 2021, the date that Gallian filed her bankruptcy petition, J-Pad and Ron Pierpont released any interest in the Property.  See, **Exhibit 102**, paragraphs 35 & 36, at 6, lines 12 – 24.  Gallian does not dispute those allegations.  By avoiding and preserving the J-Pad Lien, Golden steps into J-Pads shoes.  Golden's preservation did not enhance the rights of J-Pad.  The lien never attached and was subsequently released.  No debt is owed to J-Pad or Golden as the holder of J-Pad's interest, and the bankruptcy estate has no right to any of the proceeds of Golden's sale of Gallian's Home.

>    **D.    The Judgement in the J-Pad Adversary Action Did NOT Determine that the J-Pad Lien was Valid or Valuable, and Gallian did NOT Collaterally Attack that Judgment.**

Gallian made four simple and straightforward arguments in opposition to Golden's Motions.  She argued that a Trustee may only sell a homestead if there is non-exempt equity in the property.  She argued that her exempt interest in the property includes her right to continued possession of the property, and that right is not property of the estate and may not be sold by the Trustee.  She also argued that her exempt interest in the property. and the right to possess it. are not rights that a Trustee can sell free and clear of.  She also argued that the judgment avoiding and preserving the J-Pad lien does not give Golden the right to sell the property.

The Bankruptcy Court's tentative ruling indicated the Court did not intend to consider any of the arguments made in Gallian's Opposition because the Court viewed those arguments as a collateral attack on the Judgment (the "J-Pad Judgment") in Adversary Action 8:23-ap-01064-SC (the "J-Pad Action").  In that judgment the Bankruptcy Court ruled that the J-Pad lien was avoided and preserved for the benefit of the estate.

The Bankruptcy Court's final ruling on the Trustee's Motion to Sell followed through with this view and failed to address Gallian's arguments.  The Bankruptcy Court's view regarding collateral attack is incorrect for several reasons.  First, three of the arguments made by

1   Gallian have nothing to do with the J-Pad lien or the J-Pad Judgment.  Gallian's first argument

2   was based on California exemption law that recognizes the sanctity of an equitable interest in

3   homestead property and the right to be free from threats of dispossession.  Gallian's second and

4   third arguments were based on bankruptcy law and the rule that a Trustee may not generally sell

5   the exempt portion of property, or free and clear of that exempt portion and the rights appurtenant

6   thereto.

7          Finally, contrary to the Court's statement in its tentative and final rulings, Gallian

8   did not *collaterally* attack the J-Pad Judgment.  Gallian did not *attack* the J-Pad Judgment at all.

9   Rather, Gallian argued that avoidance and preservation of an asset does not change the

10  fundamental characteristics of the asset that has been recovered and preserved.  It does not

11  enhance those characteristics.  That is, the Trustee obtains no more through avoidance and

12  preservation than the defendant previously had in the preserved asset.

13         Collateral attack is an attack that seeks to void a previous order, not by appeal or

14  motion for reconsideration, but by a separate lawsuit.  *Crosby v. Mills*, 413 F.2d 1273 (10th Cir.

15  1969).  It is usually a challenge to the Court's jurisdiction to make the order the attacker seeks to

16  overturn.  Gallian did not seek to overturn the judgment in the J-Pad Adversary.  Gallian did not

17  assert that the Bankruptcy Court was without jurisdiction to enter the J-Pad Judgment.  Rather,

18  Gallian simply asserted that the J-Pad lien in the hands of Golden has the same characteristics as

19  the J-Pad lien had before it was avoided and preserved.

20         In the J-Pad Adversary, the Court was not required to determine if the J-Pad lien

21  was valuable.  The value of a lien a trustee seeks to avoid is not an element of the trustee's cause

22  of action under 11 U.S.C. Section 548 or 544.  In the J-Pad Adversary, Golden asserted, without

23  contradiction, that J-Pad made no loan and was owed no money.  The J-Pad Judgment does not

24  hold otherwise.  Rather, it is based on that uncontradicted assertion.  The consequences of J-Pad

25  not lending any money to anyone and not being owed anything is that the J-Pad lien never

26  attached to anything and has no value.  Another way to put it is that the J-Pad lien could have been

27  fully satisfied and the lien extinguished by paying ZERO dollars, since that's all that was owed.

28  /////

Consider a Home Equity Line of Credit ("HELOC") that is supported by a recorded deed of trust that indicates the amount of the line of credit is for $400,000.00. The recording of the deed of trust does not create the debt. The lending of money pursuant to the HELOC creates the debt. If no money is lent or borrowed, no money is owed. If a trustee were to avoid and preserve a deed of trust supporting an unfunded HELOC, the trustee would not magically be entitled to collect $400,000.00 upon the sale of the liened property. The trustee would be entitled to collect no more than the HELOC lender could have collected upon such a sale. That is ZERO. This not a "clever" argument. It is a plain statement of the incontrovertible effect of black letter law.

The same is true in this case. Golden successfully avoided and preserved the J-Pad lien. Gallian did not dispute this. But Golden is entitled to no proceeds from the sale of Gallian's home on account of the J-Pad lien because J-Pad lent no money and is owed no money. This is not a collateral attack. It is simply the undeniable consequence of the true state of affairs as alleged by Golden without contradiction.

**E.    California Law Prohibits Golden's Sale of Jamie Gallian's Home for Less than the Amount of her $600,000 Homestead Exemption.**

For bankruptcy purposes, California has opted out of federal exemptions, electing to utilize exemptions enacted under state law. 11 U.S.C. § 522(b); Cal. Civ. Proc. Code§ 703.130. Therefore, exemption questions in California bankruptcies require the application of California law. *In re Tallerico*, 532 B.R. 774, 780 (Bankr. E.D. Cal. 2015). The California legislature enacted homestead exemption laws "to protect the sanctity of the family home against a loss caused by a forced sale by creditors ... [ and] ensure that insolvent debtors and their families are not rendered homeless by virtue of an involuntary sale of the residential property they occupy .... " *Amin v. Khazindar*, 112 Cal. App.4th 582, 588 (Cal. Ct. App. 2003). As such, there is a strong public policy toward adopting "a liberal construction of the la and facts to promote the beneficial purposes of the homestead legislation to benefit the debtor." *Id.*

In California, a debtor may obtain the benefits of a homestead exemption either by recording a declaration of homestead (Cal. Civ. Proc. Code § 704.910 - § 704.995), or through an

1   automatic homestead exemption (Cal. Civ. Proc. Code§ 704.710 - §704.850). The automatic

2   homestead exemption protects a debtor from forced judicial sales of a debtor's dwelling. *In re*

3   *Diaz*, 547 B.R. 329,334 (B.A.P. 9th Cir. 2016). "The filing of a bankruptcy petition constitutes a

4   forced sale for purposes of the automatic homestead exemption." *Id*.

5           The declared homestead exemption statutes were created first. However, "the

6   Legislature was quite obviously concerned with the large number of homeowners who were not

7   receiving the benefits of the homestead because of their ignorance of the law or their failure to

8   satisfy the technical requirements for declaring a homestead." *In re Gilman*, 608 B.R. 714, 722

9   (Bankr. C.D. Cal. 2019) (citing *San Diego White Truck Co. v. Swift*, 96 Cal. App.3d 88, 92 (Cal.

10  Ct. App. 1979)). To solve this problem, the legislature created the automatic homestead

11  exemption. *Id*. California homestead statutes must be liberally construed. Cal. Civ. Proc. Code§

12  704.710 et seq. Liberal construction of California's homestead statutes serves to effectuate the

13  statutory goal of helping to prevent Californians from losing their homes through hyper-technical

14  interpretation. Cal. Civ. Proc. Code§ 704.710 et seq.

15          Additionally, the California legislature sought to broaden the interests protected by

16  the automatic homestead exemption as compared to the interests covered by its predecessor, the

17  declared homestead. An examination of the differences between the two statutory exemptions

18  further illustrates this intent. The declared homestead is expressly limited to an **"interest in real**

19  **property (whether present or future, vested or contingent, legal or equitable)** that is a

20  'dwelling' as defined in Section 704.710, but does not include a leasehold estate with an unexpired

21  term of less than two years or the interest of the beneficiary of a trust." Cal. Civ. Proc. Code

22  §704.910(c) (West) (emphasis added). Unlike the former provisions, Section 704.720 does not

23  specify the interest that is protected and does not limit the homestead in a leasehold to a long-term

24  lease; [any interest] sought to be reached by the judgment creditor in the homestead is subject to

25  the exemption. Legislative Committee Comment to Amended Cal. Civ. Proc. Code§ 704.720

26  (West) (emphasis added).

27          Substantive issues regarding the allowance or disallowance of the claimed

28  exemption at issue are governed by California Law.  *In re Diener,* 483 B.R. 196, 203 (9th Cir.

1  B.A.P. 2012). Furthermore, "[u]nder the California Code of Civil Procedure, a debtor in

2  bankruptcy's interest in her dwelling may not be sold to enforce a money judgment." *Id.* (citing

3  Cal. Civ. Proc. Code§§ 704.720, 704.740(a)).

4  Cal. Civ. Proc. Code § 704.720 (West) provides: "(a) A homestead is exempt from

5  sale under this division to the extent provided in Section 704.800."

6  Cal. Civ. Proc. Code § 704.730 (West) in effect on the date Gallian filed her

7  bankruptcy petition provided:

8  (a) The amount of the homestead exemption is the greater of the following:

9  (1) The countywide median sale price for a single-family home in the calendar year

10  prior to the calendar year in which the judgment debtor claims the exemption, not to exceed six

11  hundred thousand dollars ($600,000).

12  (2) Three hundred thousand dollars ($300,000).

13  (b) The amounts specified in this section shall adjust annually for inflation,

14  beginning on January 1, 2022, based on the change in the annual California Consumer Price Index

15  for All Urban Consumers for the prior fiscal year, published by the Department of Industrial

16  Relations.

17  The upper limit for homes in Orange County in 2021 was $600,000.00.  Golden did

18  not meet his burden of demonstrating that the Property could be sold for an amount sufficient to

19  pay Gallian the entirety of Gallian's Exempt Interest in the Property, and it did not sell for a

20  sufficient amount to do so.

21  Cal. Civ. Proc. Code § 704.800 (West) provides:

22  (a) If no bid is received at a sale of a homestead pursuant to a court order for sale

23  that exceeds the amount of the homestead exemption plus any additional amount necessary to

24  satisfy all liens and encumbrances on the property, including but not limited to any attachment or

25  judgment lien, the homestead shall not be sold and shall be released and is not thereafter subject to

26  a court order for sale upon subsequent application by the same judgment creditor for a period of

27  one year.

28  (b) If no bid is received at the sale of a homestead pursuant to a court order for sale

1    that is 90 percent or more of the fair market value determined pursuant to Section 704.780, the

2    homestead shall not be sold unless the court, upon motion of the judgment creditor, does one of

3    the following:

4            (1) Grants permission to accept the highest bid that exceeds the amount of the

5    minimum bid required by subdivision (a).

6            (2) Makes a new order for sale of the homestead.

7            The Court Order and appraisal provisions California law imposes on sales of

8    homesteaded real property do not apply to sales of homesteaded personal property.  See, Cal. Civ.

9    Proc. Code § 704.740 (West).  However, the minimum bid requirements do apply, as do the

10   prohibition against selling a homesteaded dwelling for less than the amount necessary to clear all

11   liens, and pay the judgment debtor the total amount of the exemption.  *See also*, Cal. Civ. Proc.

12   Code § 701.620 (West) applicable to execution sales of exempt personal property.  Golden's sale

13   of Gallian's home did not satisfy the minimum bid requirements.

14           **F.    Gallian's Exempt Interest in the Property is not Property of the Estate and**

15                  **Cannot be Sold by Golden.**

16           Golden asserted that through default judgments and settlements in Adversary

17   Action 8:23-ap-01064-SC he avoided and preserved various interests in the Property.  He asserted

18   that he avoided and preserved the J-Pad lien, but he did not ask for permission to sell it.  He also

19   asserted that he avoided and preserved the interests of J-Sandcastle, Ron Pierpont, Robert J.

20   McLelland, Steven D. Gallian, Brian J. Gallian, Justin Barclay and E. J. Gallian.  Golden did not

21   describe these other interests he avoided and preserved, and he did not ask for permission to sell

22   them.  Rather, he only asked for permission to sell the Property itself.

23           Golden asserted that various creditors [Houser Bros. and the Jasso Parties] have

24   recorded abstracts in the Orange County land records, but those abstracts did not create liens on

25   the Property because the Property is personal property, not real property.  Gallian does not dispute

26   this.  Because the abstracts never created liens on the Property, there is no need to avoid them, sell

27   free and clear of them or provide adequate protection for them.  Furthermore, Gallian's Exempt

28   Interest in the Property is unaffected by any judgment liens that might exist on the Property.

1  Neither Gallian nor Golden had any need to avoid judgment liens that never attached to the

2  Property.  Golden's references to the Section 522(f) of the Bankruptcy Code in his Motion to

3  Approve Sale [Docket 539] were inapposite.  See, Motion to Approve Sale, at 12, lines 3 – 11 [ER

4  105].

5           Gallian's Exempt Interest in the Property was not property of the estate.  However,

6  title to the Property, i.e. hypothetical non-exempt equity in the Property was property of the estate.

7  Because there was no non-exempt equity in the Property, and because Golden could not sell the

8  Property free and clear of Gallian's Exempt Interest in the Property, Golden's request to sell the

9  Property should have been denied.

10           "This case turns largely on the proper interpretation of California's

11           homestead exemption statute. That statute defines "homestead" as a

12           judgment debtor's principal dwelling place, Cal.Civ.Proc.Code §

13           704.710(c), and "homestead exemption" as a fixed dollar amount generated

14           from the sale of the homestead. *Id.,* § 704.730. For the Hymans that amount

15           is $45,000. *Id.,* § 704.730(a)(2). State law also provides that a judgment

16           debtor's homestead may not be sold by judgment creditors unless the sale

17           price of the homestead "exceeds the amount of the homestead exemption

18           plus any additional amount necessary to satisfy all liens and encumbrances

19           on the property...." *Id.,* § 704.800(a). If the sale price does exceed these

20           amounts, the homestead may be sold and the judgment debtor is entitled to

21           a sum equal to his homestead exemption from the proceeds of the sale. *Id.,*

22           § 704.720(b)."

23  *In re Hyman,* 967 F.2d 1316, 1318–19 (9th Cir. 1992) [Footnotes omitted].

24           Because there was admittedly no non-exempt equity in the Property over and above

25  Gallian's Exempt Interest, Golden had no right to sell the Property.

26  **G.    Bankruptcy Law Prohibits Golden's Sale of the Property Free and Clear of**

27  **Gallian's Exempt Interest in the Property Without Her Consent.**

28           Golden's Motions did not adequately address the requirements of 11 U.S.C.

1    Section 363(f).  He treated Gallian's Exempt Interest in the Property as though it was nothing

2    more than a right to receive money upon the sale of the Property, i.e., as though it was merely a

3    lien.  He asserted that Gallian's Exempt Interest in the Property was junior to the J-Pad lien and

4    the J-Pad lien was entitled to be paid more than $300,000.00.  He asserted that Gallian's Exempt

5    Interest in the Property was "out of the money" and therefore he could sell the Property without

6    paying Gallian anything or providing adequate protection for her interest in the Property.  He was

7    incorrect.

8           The automatic homestead exemption prohibits a forced sale of a homesteaded

9    dwelling unless the sale generates sufficient proceeds to pay the entire amount of the debtor's

10    exemption.  It protects the debtor from being displaced and becoming homeless as the result of a

11    forced sale of the debtor's dwelling.  To a debtor, the most important aspect of the automatic

12    homestead exemption is the right to continue to reside in the dwelling.  Golden completely ignores

13    this aspect of California's homestead law.

14           11 U.S.C. Section 363(f) provides:

15           (f) The trustee may sell property [of the estate] under subsection (b) or (c)

16           of this section free and clear of any interest in such property of an entity other than the

17           estate, only if--

18           (1) applicable nonbankruptcy law permits sale of such property free and

19           clear of such interest;

20           (2) such entity consents;

21           (3) such interest is a lien and the price at which such property is to be sold is

22           greater than the aggregate value of all liens on such property;

23           (4) such interest is in bona fide dispute; or

24           (5) such entity could be compelled, in a legal or equitable proceeding, to

25           accept a money satisfaction of such interest.

26           Gallian's Exempt Interest in the Property does not fit within any of the five

27    categories listed in Section 363(f).  As detailed above, California law prohibits a forced sale of

28    homesteaded property free and clear of the exemption for less than the amount necessary to pay

the exemption and all liens in full – thus negating categories (1), (3) and (5). Gallian did not consent to the sale. In fact, Golden did not even request her consent to the sale. Thus, category (2) does not apply. Gallian's Exempt Interest in the Property has been established in a Final Non-Appealable order of this Court [Docket 394]. Thus, category (4) does not apply. Golden cited no authority that allows a trustee to sell a debtor's homestead over the debtor's objection in these circumstances.

**V.    <u>CONCLUSION</u>**

The answer to each of the questions presented in section II above is yes. The Bankruptcy Court erred in each of the ways addressed by Appellant's Statement of Issues on Appeal. Golden had no right to sell Gallian's Home. Golden did not hold a valid or valuable lien against Gallian's Home. Peplin was not a good faith purchaser. The Court's Orders granting the Trustee's sale and turnover motions and the subsequent orders enhancing those Orders must be reversed. Gallian is entitled to the return of her home, or at the very least, she is entitled to the proceeds of the illegal sale of her home. This Court should enter judgment accordingly.

DATED: August 1, 2025                           /Christopher L. Blank
                                    CHRISTOPHER L. BLANK, Attorney for
                                    Appellant Jamie Lynn Gallian

APPELLANTS' OPENING BRIEF