CHRISTOPHER L. BLANK (SBN 115450)
CHRISTOPHER L. BLANK, ATTORNEY AT LAW, PC
2973 Harbor Blvd. #506
Costa Mesa, CA 92626
Telephone:    (949) 250-4600
Email:        chris@chrisblanklaw.com

Attorney for Appellant Jamie Lynn Gallian

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re | **District Court Case No.** |
| | **8:25-cv-00827-CV** |
| JAMIE LYNN GALLIAN | **Bankruptcy Court Case No.** |
| Debtor. | **8:21-bk-11710-SC** |
| | **APPELLANT'S APPENDEX OF TRANSCRIPTS FOR APPEAL – VOL 3** |
| JAMIE LYNN GALLIAN, Appellant | |
| vs. | |
| JEFFREY GOLDEN, TRUSTEE, Appellee | |

TO THE COURT AND INTERESTED PARTIES: Debtor/Appellant, Jamie Lynn

Gallian, hereby submits her Appendix of Transcripts Designated for Record on Appeal which are

attached hereto.

## TRANSCRIPTS OF HEARINGS

| DATE OF HEARING | TIME OF HEARING |
|---|---|
| 3/4/2025 (Santa Ana) | 11:00 A.M. |
| 3/27/2025 (Santa Ana) | 11:00 A.M. |

1

1          4/10/2025 (Santa Ana)                              9:30 A.M.

2

3

4    Dated:  July 15, 2025              CHRISTOPHER L. BLANK, ATTORNEY
                                        AT LAW, PC
5
                                   By:    /S/*Christopher L. Blank*
6                                       Christopher L. Blank, Attorney for Debtor
                                        Jamie Lynn Gallian
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  --oOo--

4   In Re:                        ) Case No. 8:21-bk-11710-SC
                                  )
5   JAMIE LYNN GALLIAN,           ) Chapter 7
                                  )
6          Debtor.                ) Santa Ana, California
    _____) Tuesday, March 4, 2025
7                                    11:00 a.m.

8                                 HEARING RE: CHAPTER 7
                                  TRUSTEE'S MOTION FOR ORDER
9                                 COMPELLING DEBTOR AND ANY
                                  OTHER OCCUPANTS TO VACATE AND
10                                TURN OVER MANUFACTURED HOME
                                  AND AUTHORIZING ISSUANCE OF
11                                WRIT OF ASSISTANCE

12                                HEARING RE: TRUSTEE'S MOTION
                                  TO AUTHORIZE SALE OF
13                                MANUFACTURED HOME CURRENTLY
                                  LOCATED AT 16222 MONTEREY
14                                LANE, SPACE 376, HUNTINGTON
                                  BEACH, CA 92649, DECAL NO.
15                                LBM1081, FREE AND CLEAR OF
                                  LIENS AND HOMESTEAD EXEMPTION

16

17              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SCOTT CLARKSON
18            UNITED STATES BANKRUPTCY JUDGE

19  APPEARANCES:

20  For the Debtor:               CHRISTOPHER L. BLANK, ESQ.
                                  Christopher L. Blank, PC
21                                2973 Harbor Boulevard
                                  Suite 506
22                                Costa Mesa, California 92626
                                  (714) 856-4626
23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

APPEARANCES:  (cont'd.)

For the Chapter 7 Trustee:        ERIC P. ISRAEL, ESQ.
                                  Levene, Neale, Bender, Yoo
                                    & Golubchik, LLP
                                  2818 La Cienega Avenue
                                  Los Angeles, California 90034
                                  (310) 229-1234

                                  JEFFREY I. GOLDEN, ESQ.
                                  Golden Goodrich, LLP
                                  3070 Bristol Street
                                  Suite 640
                                  Costa Mesa, California 92626
                                  (714) 966-1000

For Creditor Houser Bros.         D. EDWARD HAYS, ESQ.
  dba Rancho Del Rey              Marshack, Hays & Wood, LLP
  Mobile Home Estates:            870 Roosevelt
                                  Irvine, California 92620
                                  (949) 333-7777

For Creditor Huntington           ROBERT P. GOE, ESQ.
  Beach Gables Homeowners         Goe, Forsythe & Hodges, LLP
  Association:                    17701 Cowan, Suite 210
                                  Irvine, California 92614
                                  (949) 798-2460

For Richard Herr and              DAVID GUARNIO, REAL ESTATE
  Greg Peplin:                      AGENT

Court Recorder:                   Tamika Law
                                  United States Bankruptcy Court
                                  411 West Fourth Street
                                  Suite 2030
                                  Santa Ana, California 92701

Transcriber:                      Briggs Reporting Company, Inc.
                                  9711 Cactus Street
                                  Suite B
                                  Lakeside, California 92040
                                  (310) 410-4151

*Briggs Reporting Company, Inc.*

1

1  SANTA ANA, CALIFORNIA  TUESDAY, MARCH 4, 2025  11:00 AM

2                      --oOo--

3      (Call to order of the Court.)

4          THE COURT:  Calling Items Number Two and Three

5  together.  May I have appearances, please?

6          MR. ISRAEL:  Good morning, your Honor.  Eric

7  Israel of Levene, Neale, Bender, Yoo and Golubchik, LLP,

8  attorneys for the trustee.

9          MR. HAYS:  Good morning, your Honor.  For creditor

10 Houser Bros. that joined in these motions, Ed Hays of

11 Marshack, Hays, Wood, LLP.

12         MR. BLANK (via Zoom):  Good morning, your Honor.

13 Christopher Blank, B-L-A-N-K, on behalf of Debtor Jamie Lynn

14 Gallian.  And for the record, she is in my office with me.

15         THE COURT:  Good morning to everyone.

16         Any other appearances?

17         MR. GOE:  Yeah.  Thank you, your Honor.  Robert

18 Goe on behalf of the HOA.  We join in support of the motion.

19         THE COURT:  Good morning, Mr. Goe.

20         MR. PEPLIN:  And Greg Peplin here, your Honor,

21 overbidder.

22         THE COURT:  I'm sorry, your last name?  If you can

23 just --

24         MR. PEPLIN:  Peplin.

25         THE COURT:  -- spell it, please.

2

1          MR. PEPLIN:  Peplin, P-E-P-L-I-N.

2          THE COURT:  Hello, Mr. Peplin.  How are you today?

3          MR. PEPLIN:  I'm good.  Thank you.

4          THE COURT:  Good.  And where are you calling from?

5          MR. PEPLIN:  From La Verne, California.

6          THE COURT:  Okay.  Anyone else?

7          MR. HERR:  Richard Herr.  I'm the first bidder for

8  Galaxy Homes.

9          THE COURT:  And for the record, spell your last

10  name, please.

11          MR. HERR:  H-E-R-R.

12          THE COURT:  Good morning to you.  Any other --

13          MR. HERR:  Good morning, (indiscernible).

14          MR. GUARINO:  David Guarino here, real estate

15  agent, representing buyer -- both buyers, overbid -- Richard

16  Herr and Greg Peplin, overbidder.

17          THE COURT:  You represent both of them?

18          MR. GUARINO:  Yes.

19          THE COURT:  Okay.  How do you spell your last

20  name?

21          MR. GUARINO:  G-U-A-R-I-N-O, David.

22          THE COURT:  All right.  Anyone else?

23          MR. GOLDEN:  Your Honor, Jeffrey Golden, Trustee.

24          THE COURT:  Hello, Mr. Golden.

25          Anyone else?  Let's hear from the moving party,

3

1  the Chapter 7 Trustee's counsel.  And let me preface this by

2  saying that there was an improper surreply filed under the

3  name of a notice of appeal.  And while the Federal Rules of

4  Appellate Procedure allow notices of -- a request for

5  motions for stay pending appeal to be filed before a notice

6  of appeal -- I mean, we haven't even ruled on this yet, but

7  I noticed that in detail the essence of the motion for stay

8  pending appeal.  And, therefore, I'm treating it as a

9  surreply because it went in deeply to the reply and the

10  analysis of the motion under bankruptcy rule -- Local

11  Bankruptcy Rule 9013-1(g)(3).  Unless the Court finds good

12  cause, a reply document not filed or served in accordance

13  with that particular rule will not be considered.

14          But it's like a gift that keeps giving.  It

15  actually sets out what Ms. Gallian's view is of this

16  particular motion.  And so, I would like to add that to the

17  record as a surreply and invite the trustee to address that,

18  as well as the entirety of the motion.

19          Mr. Israel?

20          MR. ISRAEL:  Yes, your Honor.

21          THE COURT:  One more thing, Mr. Israel.  Can you

22  -- are you able to give background for the record of this

23  entire bankruptcy case?

24          MR. ISRAEL:  I will do my best, your Honor.

25  There's quite an extended history here.

4

1          THE COURT:  And that's why I wanted to make sure

2    it's on the record.

3          MR. ISRAEL:  Yes, your Honor.  The case has been

4    pending for over three-and-a-half years as a Chapter 7.  The

5    only known administerable asset is this manufactured home

6    that's at bar in this sale motion.

7          The Debtor has amended her schedules, I believe 14

8    times, if I counted it correctly.  She has filed multiple

9    motions under 522(f).  She moved to convert the case.  Her

10   discharge was denied or revoked.  She's filed multiple

11   exemption -- amended exemptions, which other than the

12   homestead exemption, were all denied to my recollection.

13         Your Honor, the -- on the original schedules, and

14   I believe all or most of them since then, it acknowledged

15   that title was in the name of J-Sandcastle to the

16   manufactured home, and it was subject to a lien in a set

17   sum.  I believe the original principal amount was $225,000

18   in favor of an entity called "J Pad."

19         The trustee about a year ago brought a motion --

20   or an application to employ a real estate broker.  The

21   Debtor opposed arguing that title was not in her name, and

22   that there was a lien in favor of J Pad.  The court on that

23   basis denied without prejudice the trustee's employment

24   application for the real estate broker.

25         The trustee then filed an adversary proceeding

5

1  before your Honor, which has been resolved in full by final

2  orders, avoiding all the liens, including the J Pad lien,

3  and avoiding the title in J-Sandcastle, and providing that

4  all are avoided and preserved for the benefit of the trustee

5  on behalf of the estate.

6          On that basis, last summer the trustee brought a

7  second application to employ the real estate broker.  The

8  Court, after objection, granted -- approved that employment

9  application.  The trustee marketed the property.  There was

10 some interference along the way by the Debtor, but

11 ultimately she did -- after delays and the like, did allow

12 for some showings.  And the trustee received the offer at

13 bar from -- originally it was Richard Herr, and he executed

14 an amendment that Galaxy Homes would be the buyer.

15         Your Honor, we did -- the trustee did file on

16 Friday a supplemental declaration concerning the overbid

17 that was received.  He did receive one overbid from Greg

18 Peplin, who is appearing here.  There was some disclosures

19 we made, including the joint representation of the real

20 estate brokers -- broker.

21         Again, it's the -- well, to be clear, it's not a

22 joint representation with the trustee.  The trustee's

23 brokers are only representing the trustee in this

24 transaction, although, as I have -- we disclosed in that

25 supplemental declaration, they represented a different

6

1 trustee in a different case, selling Mr. Peplin's property.

2 He received money from a homestead exemption, which I

3 understand he needs to re-invest within a period of time,

4 and he chose this property to make an overbid on to

5 purchase.

6          Mr. Golden was not involved in that other case.  I

7 was not involved in that other case.  And again, the real

8 estate brokers at Coldwell Banker that do represent the

9 trustee, are not representing either the original buyer or

10 Mr. Peplin as the overbidder.  But the broker that is

11 representing Mr. Peplin is also representing the original

12 buyer.  We didn't chose brokers.  But we wanted to disclose

13 all of that for your Honor.

14          It's possible I missed a step or two along the

15 way, but I think that's the gist of it.  Your Honor, we're

16 -- after a lot of work, we're here.  We have a sale motion

17 and a turnover motion.  And, your Honor, we have -- the

18 trustee has seen your Honor's tentatives and agrees with

19 both of them.

20          With respect to the request for a waiver of the

21 stay under Rule 6004 -- what is it, (h)?  The trustee, in

22 light of the fact that there is an opposition, withdraws the

23 request to waive that provision.  And with that, the trustee

24 would request that your Honor approve both motions.

25          THE COURT:  Mr. Israel, would you like to address

7

1  the surreply or the motion for stay pending appeal that was

2  filed, that I'm characterizing it as a surreply?

3          MR. ISRAEL:  Yes, your Honor.  Your Honor, it was

4  just filed yesterday.  I did read it through once, and I

5  would like to go through the elements for a stay pending

6  appeal.  Again, your Honor hasn't granted the motion yet,

7  but that's the gist of this.  And the Debtor cites the BAP

8  -- Ninth Circuit BAP case of <u>Weimar</u> (phonetic), and cites to

9  the four elements.  One, is the appellant likely to succeed

10 on the merits of the appeal?

11         Clearly, the trustee in the motion and the reply

12 does not believe that there's merit to the Debtor's

13 position.  Your Honor's tentative would seem to support that

14 position.  And the trustee believes that this factor does

15 not support a stay.

16         The second element is, will the appellant suffer

17 irreparable injury?  The Debtor, your Honor, again, filed

18 this case voluntarily back in 2021.  She has thwarted

19 creditors for over three-and-a-half years, played games,

20 lied on her schedules and elsewhere, such that her discharge

21 has been revoked.  She has filed a myriad of unsuccessful

22 motions in unsuccessful attempts to amend her exemptions.

23 The Court even had to issue sua sponte an OSC re contempt.

24         In any event, when a debtor files bankruptcy, he

25 or she must surrender property of the estate to the trustee

8

1  to be liquidated for the benefit of creditors.  She had a

2  duty to do so under Section 521 of the Bankruptcy Code.

3  Complying with her duty under the code the trustee submits,

4  cannot qualify as irreparable injury.  If there is any harm,

5  it was fully contemplated when she chose to file bankruptcy.

6  Your Honor, we submit that this factor does not support

7  issuance of a stay either.

8       The third element, your Honor, no substantial harm

9  will come to appellee, that would be the trustee, assuming

10 that the Debtor does appeal.  To the contrary, the trustee

11 again has worked for over three-and-a-half years to get this

12 property ready for sale.  He commenced litigation to avoid

13 transfers of title and liens.  He hired a real estate broker

14 who -- which worked diligently here for months to bring in a

15 buyer and later an overbidder.

16      The buyer can't wait for the Debtor's losing

17 arguments to be reconsidered on appeal.  The trustee, the

18 broker and the buyer will all suffer significant harm if a

19 stay pending appeal were granted.

20      And, your Honor, the fourth element, the stay will

21 do no harm to the public interest.  Trustees are charged

22 with liquidating assets for the benefit of creditors as

23 quickly as reasonably possible.  Here, it's already been

24 over three-and-a-half years.  The trustee submits that there

25 is a strong public policy against delaying bankruptcy sales.

9

1  Delays in closing sales would certainly have a negative

2  affect on what buyers are willing to pay for assets.  That's

3  chilling bidding, directly contrary to the public interest.

4       This policy is codified at Section 363(m), and,

5  your Honor, the trustee has requested a good-faith purchaser

6  finding under 363(m).  And the trustee submits this is --

7  that this factor also strongly mandates against issuing a

8  stay.

9       So for all those reasons, we believe that the

10 Debtor's motion fails every element required for a stay

11 pending appeal, and request that your Honor deny that

12 motion.

13       THE COURT:  Mr. Israel, the -- basically first

14 element of granting a stay pending appeal would be a showing

15 that the plaintiff -- a strong showing I should say, that

16 the plaintiff has the likelihood of success on the merits.

17 I think you would like to -- or I would like to hear from

18 you a discussion of the merits of the analysis provided by

19 Ms. Gallian in her motion for stay pending appeal.

20       MR. ISRAEL:  Yes, your Honor.  As to the sale

21 motion, your Honor, the Debtor attempts to collaterally

22 attack final judgments of this Court, as your Honor notes in

23 the tentative, that she may not do.

24       She also argues that the trustee cannot sell

25 property without paying her homestead exemption in full, but

10

1  that is legally incorrect.  The Debtor may only exempt

2  equity after consensual liens.  Although the code allows her

3  to avoid involuntary liens, which she has not successfully

4  done here, under Section 522(g) she is barred from exempting

5  consensual transfers and liens that the trustee avoids.

6          Section 551 provides that avoided liens and

7  transfers are automatically preserved for the benefit of the

8  estate.  The statute provides that junior interests do not

9  move up.  The estate gets that position.  Here, the

10 homestead exemption is such a junior interest.  It's junior

11 to the consensual liens that the trustee avoided and

12 preserved.  The Roach case from this district, which was

13 affirmed by the BAP, so provides.

14         The Debtor also argues that the trustee must take

15 the avoided lien and foreclose on it under state law.  The

16 Debtor admits that she has found no cases that so provide,

17 and that, again, is not the law.  Federal law of course

18 preempts state law, if contrary, and the U.S. Constitution

19 provides that Congress may enact a uniform bankruptcy law

20 which it has done.

21         The bankruptcy statutes at bar here are the

22 supreme law of the land, and those are the statutes that

23 apply to a sale of property by a bankruptcy trustee.  Again,

24 the Roach case is on all fours with that.

25         Moreover, the trustee also recovered title, so he

11

1  is not restricted to foreclosing on the lien.  The Debtor

2  argues now that there was no debt supporting the J Pad lien,

3  and hence, that the trustee avoided and preserved nothing.

4  The Ninth Circuit <u>Van De Kamp</u> case says that the court

5  should not look behind an avoided lien to determine whether

6  there was an allowable claim supporting it, as the Debtor

7  tries to do here.  The Debtor contemplate -- completely

8  ignores <u>Van De Kamp</u>, other than attempting to distinguish it

9  as a dispute between two creditors.  That argument though

10 makes no sense.

11         Trustees have the power of creditors to avoid

12 transfers and liens under Section 544(b).  It would make no

13 sense for creditors to not have to look at the allowability

14 of the underlying claim, which is what <u>Van De Kamp</u> holds,

15 but trustees must?  <u>Van De Kamp</u> is Ninth Circuit binding

16 precedent, your Honor.

17         On the merits, the Debtor has filed a myriad of

18 amendments to her schedules, and she states in all or most

19 of them under penalty of perjury, the title to the property

20 on the petition date was held by J-Sandcastle, and that J

21 Pad holds the senior consensual lien on the property.  But

22 there's more.

23         She even filed a proof of claim last October

24 against the estate claiming the entire amount is due and

25 owing to her as a secured claim.  That's claim number 7-1.

12

1  It's attached as Exhibit 11 to the sale motion.  She

2  attaches the security agreement to the -- her proof of

3  claim, and contends that 225,000, I believe plus interest,

4  is owing on that claim to her on a secured basis.  That's

5  yet and -- another admission, that there was both a debt and

6  a lien.

7          Finally, your Honor, the Debtor is judicially

8  estopped from raising this argument.  When the trustee first

9  sought to employ a real estate broker, the Debtor opposed

10 the application and argued, among other things, that title

11 and the lien barred a sale.  The Court agreed with her and

12 denied the application without prejudice.

13         The trustee then commenced an adversary proceeding

14 and actually avoided the transfers of title and the lien --

15 and the liens.  Now the Debtor argues that there never was a

16 loan.  The Debtor is judicially estopped from changing her

17 positions as she is attempting to do here.  There was a lien

18 of record that the trustee avoided and preserved, and the

19 trustee is entitled to the payment due under that lien,

20 which is senior to a homestead exemption.

21         THE COURT:  Would you briefly describe the actual

22 motion for an order approving the overbid procedures and the

23 final sale?

24         MR. ISRAEL:  Yes, your Honor.  The trustee

25 obtained an offer from Galaxy Homes, which was assigned to

13

1  Galaxy Homes, the purchase of the property.  The trustee

2  negotiated with that buyer, and agreed -- arrived at a sale

3  price, subject to court approval and overbids, of $275,000.

4  That is the request in the motion to approve that sale,

5  again, subject to overbids, if there were an overbidder,

6  which we do have.

7          The liens, your Honor, we've discussed at length.

8  The trustee has avoided all the consensual liens.  There are

9  involuntary liens via abstract of judgment that were

10  recorded, and the motion discusses why an abstract of

11  judgment does not attach to a manufactured home, which is

12  personal property.  And my understanding is that the

13  involuntary lienholders are -- well, one, they did not

14  oppose the motion, and, two, they're -- one or both of them

15  are represented here and they support this motion.  And in

16  any event, that's junior to the consensual liens that the

17  trustee has avoided and preserved.

18          So the proceeds will go into the estate, your

19  Honor.  And absent significant overbidding, there wouldn't

20  be enough money to go to the homestead exemption, which

21  again, is junior to the consensual lien of J Pad that the

22  trustee avoided and preserved.

23          And the overbid procedures, your Honor, that the

24  trustee has proposed, is that the minimum overbid amount was

25  the $1,000, so it would be $276,000.  The trustee requires

14

1   that overbidders submit, I believe it was three days before

2   this hearing, an overbid on the form attached to the motion,

3   which acknowledges that the overbidder has received the

4   motion.  That they agree to be bound by all the terms in the

5   motion, other than price, and that the minimum increments

6   for overbidding would be $1,000 from that point.

7           Also, to qualify, the overbidder was required to

8   put up a deposit of three-percent, which Mr. Peplin has

9   done.  He's also filled out that overbid from.  And also the

10  overbidder is required to provide proof of ability to close.

11  And I have seen the -- a bank statement from Mr. Peplin

12  showing that he does have funds in cash to close this sale.

13          The overbid terms also provide that there's no

14  contingencies, and that buyer -- that no -- the party making

15  an overbid has done whatever due diligence they need to do,

16  and there are no contingencies, including financing

17  contingencies to close the sale.

18          So, I think those were the operative terms of the

19  motion, your Honor.

20          THE COURT:  Thank you, Mr. Israel.

21          Are there any other parties that would like to

22  speak up in support of the motion, which is Item Number

23  Three on our calendar this morning?

24          MR. HAYS:  Yes, your Honor.  This is Ed Hays.  I'd

25  like to be heard.

15

1          THE COURT:  Mr. Hays, please proceed.

2          MR. HAYS:  Thank you, your Honor.  With respect to

3    one of the motions, which is the turnover motion, Section

4    542 on its face says that anybody in possession of property

5    of the estate are -- and property in which the Debtor may

6    claim an exemption, must turn that property over.

7          So with respect to the motion for turnover, just

8    because the Debtor has an allowed exemption which became

9    final is not grounds to defeat a motion for turnover.

10          With respect to the motion for sale of the

11    property, the trustee may sell property of the estate so

12    long as the trustee has a valid business purpose.  Here, the

13    purpose is to realize the benefit of the avoided lien

14    through a sale of the property.

15          The Debtor in her opposition argues extensively

16    and relies extensively on California's enforcement of

17    judgment law with respect to minimum bids and other sections

18    within that body of law.  However, this is not the

19    enforcement of a judgment, and there is no involuntary

20    judgment which is the motivating force behind this proposed

21    sale of the property.

22          Here, the Debtor voluntarily filed a Chapter 7

23    bankruptcy that resulted in the appointment of a trustee

24    that has a statutory duty to administer assets for the

25    benefit of creditors.  The bankruptcy code specifically

16

permits trustees to sell property of the estate, and here
the trustee also had the ability to exercise his strong arm
powers to avoid fraudulent transfers, which resulted in the
avoidance, recovery and preservation of a fraudulent lien.
And the trustee can combine his powers here, the power to
sell real property that is owned by the estate, in order to
realize the benefit of the lien which the trustee recovered.

The facts of this case are very similar to the
cited case of In Re <u>Roach</u>.  <u>Roach</u> was a slightly different
scenario, but it was still a voluntary transfer of an
interest of the debtor in property in the form of a deed of
trust.  The trustee in that case avoided and recovered a
portion of that lien through a subordination agreement.  And
then the trustee moved to sell the property to realize the
benefit of what the trustee recovered through the
subordination agreement, which was a one-half interest in a
third deed of trust.  When the trustee moved to sell the
property, the trustee filed a separate motion for an order
with respect to the distribution of the proceeds from the
sale of the property.  The court granted both motions.  That
was Judge Theodore C. Albert, our current Chief Judge, and
the debtor appealed.

The -- while the order of sale appeal was
dismissed as moot, the BAP affirmed the distribution order
because the debtor has voluntarily provided an interest in

17

1  this lien to a creditor, and then when the trustee recovered

2  that interest through the subordination, Section 522(g) on

3  its face prohibits a debtor from claiming an exemption in

4  property she voluntarily transferred after the trustee

5  recovered it.

6         Here, that's exactly what has happened.  The

7  Debtor voluntarily put a fraudulent lien against the

8  property.  The trustee has avoided and recovered that lien.

9  The Debtor then tries to argue that there was no underlying

10 claim, and that the lien was purely fraudulent.  But the

11 purely fraudulent nature of the lien is an element which

12 allowed the trustee to avoid, recover and preserve it, but

13 it is not a sword that the Debtor can use in order to try to

14 escape the consequences of her own voluntary fraudulent

15 actions and the consequences of what Section 522(g) require.

16        The Debtor also argues that the sale could not be

17 conducted by the trustee because -- under 363, because she's

18 got a homestead interest.  But 363(f)(1) clearly provides

19 that the Court can approve a sale if applicable non-

20 bankruptcy law provides for that.  And here, non-bankruptcy

21 law allows the enforcement of a senior -- a lien with

22 seniority, which would be a voluntary lien to wipe out a

23 homestead interest in the property.

24        And lastly, the -- I join in trustee's counsel's

25 comments with respect to the <u>Van De Kamp</u> case here being

18

1  controlling.  In <u>Van De Kamp</u> the fraudulent lien which the

2  trustee avoided was avoided because the debtor had no

3  liability on the underlying complain which was owed by the

4  debtor's principal.  But the debtor's principal used the

5  debtor's assets as collateral for this debt that he owed.

6          And so when the trustee avoided, recovered and

7  preserved the fraudulent lien, junior creditors tried to

8  attack that lien as fraudulent, and, therefore, the trustee

9  didn't realize any benefit for the estate.  And the Ninth

10 Circuit said, no, that's not what preservation does.

11 Preservation allows the trustee to step into the shoes of

12 the lienholder.

13         And here, the underlying liens were avoided

14 because they were fraudulent, and under California law, a

15 California Supreme Court has long held that a fraudulent

16 transfer is enforceable between transferor and transferee.

17 And that's the case of <u>Moore v. Schneider</u> from 1925, and

18 here is the quote from that case:

19             "The grantor in a deed made for the

20             purpose of defrauding, hindering or

21             delaying his creditors cannot be

22             relieved against its operation.  As to

23             him or her, it is valid."

24         So the trustee has avoided, recovered and

25 preserved the lien as standing in the shoes of the

19

1  lienholder.  And as between the transferor debtor and the

2  transferee lienholder, which is now the bankruptcy trustee,

3  that lien is enforceable.

4          So there is no law cited by the Debtor that allows

5  her to estate the consequences of her acts.  And her

6  reliance on the commercial code doesn't get her anywhere a

7  because a mobile home is property that is controlled by

8  certificates of title, and the commercial code has no

9  bearing on the creation or enforcement of liens governed by

10 certificated titles.

11         All in all, the Debtor is estopped from now trying

12 to use her own fraud for her benefit and to escape the

13 consequences of her actions.

14         With respect to the motion for stay pending

15 appeal, I believe that Federal Rule of Bankruptcy Procedure

16 8007 requires that there be an order entered first before

17 you move for a stay pending appeal.  So I believe the Court

18 is correct to treat this as a surreply, and no matter how

19 this motion is viewed, it procedurally was improper to file

20 a motion a day before a hearing without notice or without

21 requesting an order shortening time, or filing it on the

22 basis of an emergency motion procedure.

23         So all in all, the Debtor has not presented any

24 reason why the trustee's motions for turnover and motions

25 for sale cannot and should not be granted.  And to -- we

20

1  would request that the Court permit the trustee to conduct

2  the auction since we have two buyers here.

3          And delaying the auction or the closing of the

4  sale will prejudice creditors, especially my client, because

5  as the Court knows, the Debtor basically trespassed by

6  moving onto the property without -- without ever having a

7  lease, and the Debtor filed this bankruptcy case three-and-

8  a-half years ago to stop the unlawful detainer action from

9  proceeding to trial.

10         And so, there will be prejudice to creditors, and

11  also any distributions that may come from the sale of the

12  property would be further delayed by any appeals.  So we'd

13  request the Court grant both motions.

14         THE COURT:  Mr. Hays, can you remind the Court of

15  why the Debtor lost her discharge?

16         MR. HAYS:  Yes, your Honor.  There were a number

17  of different factors, but some of the ones that are more

18  relevant to today is that the Debtor concealed her interest

19  in this very property, which is the subject of the motion

20  for sale.

21         First she used her personal money to acquire the

22  mobile home, but placed title in one of her LLC's.  And then

23  the Debtor further concealed her equity in the home by

24  putting the very fraudulent lien that the trustee avoided

25  and recovered on her home.

*Briggs Reporting Company, Inc.*

21

1           And the Court in its memorandum decision entered

2    in the discharge action, which is Case Number 8:21-ap-01097.

3    In the memorandum decision entered on May 23rd of 2023 as

4    docket 81, the Court stated:

5                   "Additionally, facts were presented

6               to the court demonstrating that

7               defendant further concealed her equity

8               in the property through the granting of

9               liens to her business entities and

10              family members, which liens existed

11              during the relevant time period.

12                  For example, in late 2018,

13              defendant also executed a promissory

14              note and security agreement on the

15              mobile home by and between two entities

16              that she managed, J-Sandcastle and J

17              Pad, LLC.  J-Sandcastle was the borrower

18              and J Pad the lender.  The agreement

19              required J-Sandcastle to pay J Pad

20              $225,000 for a purported loan.

21                  The..."

22              Sorry.  My screen changed on me.  There.

23              The Court then goes on to conclude:

24              "...the court finds such explanations to

25              be insufficient to refute the

22

1          overwhelming evidence demonstrating that

2          Defendant has the requisite intent to

3          hinder, delay or defraud her creditor

4          when she transferred and concealed her

5          interest in the property described

6          above."

7          So the lien that the trustee avoided and recovered

8  is the lien that resulted in part -- her discharge being

9  denied in part, and, therefore, there is no question that

10 this lien is the result of the Debtor's own voluntary fraud.

11          THE COURT:  Mr. Hays, you mentioned the Federal

12 Rules of Appellate Procedure -- Bankruptcy Rules of

13 Appellate Procedure.  And you mentioned that there has to be

14 a judgment or order issued before the filing of any notice

15 of -- or request for stay pending appeal.  But I will point

16 out to you that at least the case law in the federal courts

17 is that a notice of appeal itself is not necessary for

18 filing a motion for stay pending appeal.  But, again, that

19 notice of appeal would even be timely after the issuance of

20 any judgment or order by the court by which the appellant

21 would want to appeal.

22          Are there any other parties wishing to be heard in

23 favor of the sale motion?

24          MR. GOE:  Yes.  Thank you, your Honor.  Robert Goe

25 for the judgment creditor, the homeowners association.  We

23

1  support the -- the trustee's motion and concur with the

2  comments of Mr. Hays and Mr. Israel.

3          THE COURT:  Well, thank you, Mr. Goe.

4          Are there any others who support the motion?

5          Hearing none, are there any parties wishing to

6  discuss opposition to Item Number Three, the motion by the

7  trustee to authorize the sale of the manufactured home?

8          MR. BLANK:  Yes, your Honor.  Mr. Blank on behalf

9  of the Debtor, Jamie Gallian.

10          THE COURT:  Please proceed.

11          MR. BLANK:  Thank you, your Honor.  There's a lot

12  to unpack here.  I think I'd like to start just by putting

13  on the record the fact that Ms. Gallian has represented

14  herself throughout most of the three-and-a-half years of

15  this bankruptcy.  And a lot of what has happened in this

16  bankruptcy can be attributed to the fact that she has not or

17  was not able to obtain counsel to help her.  Not necessarily

18  an excuse, but at least a bit of an explanation for how

19  things have gotten to where they are.

20          I'd also like to put on the record that a motion

21  such as this one, a motion for sale, should be based on the

22  evidence that's filed with the moving papers.  And to the

23  extent that Mr. Israel or Mr. Hays are testifying about what

24  went on in this case previously, that those comments should

25  be ignored by the Court.  The Court should make its decision

24

1  based on the evidence that was submitted with the moving

2  papers.

3          THE COURT:  Mr. Blank, I wanted to amplify what

4  you just said.  None of what Mr. Hays or Mr. Israel stated

5  is evidence, and I wanted to agree with you.  But what I

6  would probably take issue with you is, that I get to review

7  the entirety of the record that is part of this bankruptcy.

8  The docket, the pleadings, the evidence within the docket.

9          So, I agree with you that Mr. Hays and Mr. Israel

10  and you are not providing any evidence, you're just arguing.

11  And when we come back I'll ask you the significance of Ms.

12  Gallian not being able to locate counsel.  And the question

13  I would have is, perhaps no counsel would represent her.

14          MR. BLANK:  An interesting point, your Honor.  I'm

15  not sure what relevance it has, but on the question --

16          THE COURT:  Well, it's as much -- it's as relevant

17  as what you've said.

18          MR. BLANK:  Okay.

19          THE COURT:  Please proceed.

20          MR. BLANK:  All right.  So let's talk about the

21  evidence and the Court's ability to review the entirety of

22  the record.  I agree, the Court has that ability and should

23  take the opportunity.  On the other hand, someone who wants

24  to oppose a motion has a right to respond to the evidence

25  that is submitted in support of the motion.  And if the

25

1  Court wants to go beyond what the moving party has put in

2  its moving papers, then the opponent should have an

3  opportunity to respond to that in a timely manner.  So we'll

4  just put a pin in that for the moment.

5          The other thing I want to -- to let the Court know

6  is that Ms. Gallian is not opposed to mediating with all of

7  the parties in this action to see if we can figure out if we

8  can have a consensual sale of this property.  There are

9  potential benefits to everyone involved to a consensual

10  sale, rather than a sale that goes forward in the face of

11  opposition and a potential appeal and a possible stay

12  pending appeal.

13          So, Ms. Gallian stands ready to participate in

14  that way if the Court were to order it or if the other

15  parties were to consent to it.  And personally, I think

16  that's the very best way for this case to get resolved.

17  Nevertheless, I'm also prepared to respond to each and every

18  one of the arguments that have been made in court here

19  today, so that we have an adequate record of the arguments,

20  both for and against the sale.

21          So, shall I proceed with that opposition?

22          THE COURT:  You can proceed with anything you'd

23  like, Mr. Blank.

24          MR. BLANK:  Okay.  I'm a little puzzled.  I'm now

25  seeing this great seal of the bankruptcy court in the

26

1  Central District -- there we go.  Now I see your Honor again

2  -- and now I see the seal again.

3            THE COURT:  Please proceed, Mr. Blank.

4            MR. BLANK:  Okay.  So that's deliberate that the

5  seal is up instead of -- now the video's back.  I'm sorry,

6  I've just -- I can't hear you now.

7            THE COURT:  I don't understand what you're

8  complaining about, but I will explain that I had oral

9  surgery, and every few minutes I have to deal with the

10  problem of having just engaged in oral surgery.  And I don't

11  think the audience on Zoom wants to see me dealing with it.

12            MR. BLANK:  That's fair enough.  I just wanted to

13  make sure --

14            THE COURT:  Okay.

15            MR. BLANK:  -- that you were still there, still

16  able to hear me.

17            THE COURT:  Yes.  Yes, I am here.  I always be

18  here for you, Mr. Blank.

19            MR. BLANK:  Thank you, your Honor.  All right.

20  Let's start with the issue of the denial of Ms. Gallian's

21  discharge.  As far as I can tell, denial of a discharge does

22  not vitiate the Debtor's exemption rights.  As far as I can

23  tell, the denial of a discharge has no bearing on a motion

24  to sell property pursuant to 363 -- yeah, Section 363 of the

25  Bankruptcy Code.  To me it just sounds like a way of trying

27

1   to besmirch the Debtor and trying to give reasons for

2   ignoring her exemption rights.

3           Let's talk for a moment about what those exemption

4   rights are, because as we pointed out in our opposition, the

5   trustee treats those exemption rights as though they are

6   nothing more than a lien.  And Mr. Hays even said that by

7   filing bankruptcy -- if I understood him correctly, by

8   filing bankruptcy the Debtor gives up any right to maintain

9   possession of the exempt asset.  That the Debtor somehow

10  consents to the sale of exempt assets, whether there's any

11  non-exempt equity in them or not.  That's an astounding

12  proposition, and I think 110-percent contrary to applicable

13  law.

14          Under state law, debtors have exemption rights in

15  their dwellings.  Ms. Gallian has been found to have an

16  unassailable exemption right in her equitable interest in

17  this home.  That exemption right includes the right to

18  continue to reside there.  A state creditor has not right to

19  sell someone's dwelling without complying with the state

20  enforcement of judgments law.  A bankruptcy trustee

21  similarly has no right to dispossess a debtor from their

22  exempt dwelling without complying with the state exemption

23  law.

24          The trustee, together with Mr. Hays' client in

25  their joint opposition, do not address that issue at all.

28

1   They have essentially conceded it, except that Mr. Hays

2   brings it up and makes the astounding statement that when

3   you file bankruptcy, you give up your right to possess your

4   dwelling, even if your dwelling is exempt.  That's not the

5   law, and if the Court bases its decision today on that

6   interpretation of the law, the Court is making a grievous

7   error.

8           Next, there has been a suggestion that the Debtor

9   is saying that if the trustee wants to sell her home, he

10  must foreclose, and that's not what our argument has been.

11  What our argument has been is that avoidance and

12  preservation of a lien doesn't not obviate the possessory

13  rights appurtenant to the exemption that the Debtor has in

14  her dwelling.

15          So, by avoiding and preserving a lien, a trustee

16  could argue that with the consent of the debtor, there will

17  be proceeds potentially for the estate in selling the

18  property.  But it does not take away the debtor's right to

19  continue to possess her exempt dwelling, her home.

20          The trustee, having avoided and preserved the

21  supposed J Pad lien, could try to foreclose on it.  That is

22  an option that the trustee could pursue.  The trustee has

23  not done so, and there's very good reason why it would

24  probably not be a good idea.  One of the reasons it would

25  not be a good idea is because a debtor with a consensual

29

1  lien has a right to redeem the property by paying the amount

2  of the outstanding debt.  The amount of the outstanding debt

3  is zero.  Ms. Gallian has the right to redeem her property,

4  her exempt interest in her home by paying zero dollars if

5  the trustee were to try to foreclose.

6          The trustee also has the option of trying to sell

7  the avoided and preserved asset.  That is, the trustee could

8  say, I've avoided and preserved the J Pad lien.  Who would

9  like to buy?  No one is going to want to buy that lien,

10  because anyone who would buy that lien would have to

11  understand that that lien is entitled to no payment because

12  there was no loan made.  And we know that there was no loan

13  made not just because Ms. Gallian has said so, but because

14  the trustee himself has said so.

15          In the adversary action in which the P Pad lien

16  was avoided and preserved, the trustee alleged no loan was

17  made.  We agree, no loan was made.  The trustee has said, no

18  value was given.  We agree, no value was given.  Mr. Hays is

19  incorrect when he says the commercial code has nothing to do

20  with security interests in manufactured homes.  That is

21  absolutely not the law of the State of California.  The

22  commercial code does govern the attachment and enforcement

23  of liens.

24          What is special about manufactured homes and the

25  provisions under the health and community development code

30

1   are that they govern perfection, just as the vehicle code

2   governs perfection of liens on automobiles.  If someone

3   said, I'll go ahead and lend you money on your title.  I

4   want you to put me on as a legal lienholder on your

5   certificate of title of your car, that would perfect a lien

6   if a loan were actually made.  But if there is no loan made,

7   there is no attachment, there is no money owed, and there is

8   no right to collect any money on the lien.  That is the

9   circumstance that we have here.

10          There was a discussion about Ms. Gallian not

11   successfully avoiding any judgment liens on her home, but

12   there was also an admission that there are no judgment liens

13   on her home.  There are no judgment liens on her home

14   because her home is personal property, not real property.

15   Because her home is personal property, the way you obtain a

16   lien on a personal property dwelling is by levying on it.

17   No one has levied on it.  No one has argued that they levied

18   on it.

19          The trustee has correctly stated that the

20   recordation of an abstract in the county land records does

21   not create a judgment lien on a personal property dwelling.

22   So there is no judgment on this property.  There was no deed

23   for Ms. Gallian to try to avoid any judgment liens on her

24   dwelling, nor is there any reason for the trustee to try to

25   avoid any judgment liens on her dwelling because there are

31

1    none.

2           What we have is Ms. Gallian's exempt interest in

3    her equitable rights in that property, and what we have is a

4    lien that Ms. Gallian attempted to perfect by recording

5    documents both with the California Secretary of State, those

6    documents being ineffective because that's not how you

7    perfect a lien on a mobile home or a manufactured home, and

8    documents that were filed with the Department of Housing and

9    Community Development.  Those also were ineffective to

10   create a debt.  They were ineffective to attach a lien.

11          If there were a debt, if a lien had attached to

12   the property, those documents would have been sufficient to

13   perfect that lien.  But this isn't a case about perfection.

14   This is a case about whether an actual debt exists.  This is

15   a case about whether a debt is owed, and by the trustee's

16   own allegations, the answer is, no, there is no debt owed.

17          Let's take a hypothetical for just a moment.  I

18   want to turn back to this question.  Let's say there had

19   been a lien on this property.  Let's say it was in favor of

20   Wells Fargo Bank.  No doubt, money actually lent, no doubt

21   money actually owed, and that the money owed exceeded the

22   value of the property.  Is there any doubt that the trustee

23   in this bankruptcy would have no right to sell that property

24   which is over-encumbered by a consensual lien?  I submit the

25   answer's, no.

32

1          There's absolutely no doubt a trustee is not

2    authorized to sell property in which there is no non-exempt

3    equity.  The trustee's correct approach to that would be to

4    -- to abandon the property to the debtor, and let Wells

5    Fargo do whatever it decided to do to enforce its lien

6    rights.

7          Now this case is slightly different, but it's

8    important to realize that in the ordinary course of things,

9    trustees do not get to sell property in which there is no

10   non-exempt equity.  The exceptions to that rule happen to be

11   when the trustee either negotiates with a lienholder to

12   share some of those lien proceeds, or where a trustee avoids

13   and preserves those lien rights.

14         So let's talk about Van De Kamp for a moment,

15   because that is the one published case that has at least

16   some bearing on this matter.  In that case it was a fight

17   between two creditors, labor unions and a creditor who was

18   owed money by the president of that company.  In that case

19   there was no doubt that the debt existed.  There was no

20   doubt that the money was owed.

21         The question was whether it was a fraudulent

22   transfer for the company to encumber its assets to secure

23   the president's debt.  And the court rightfully determined

24   that that was a fraudulent transfer, therefore, the court

25   authorized the avoidance and preservation of that lien.

33

1  Because the debt was actually owed, that case is
2  distinguishable from our case.  And the issue of whether
3  absent a bankruptcy, the competing creditor could have
4  pursued a fraudulent transfer action and also avoided that
5  lien, does not have anything to do with our case.
6          In that case the court said, yeah, perhaps you
7  could have in state court avoided that lien, but you didn't,
8  the trustee did.  And when the trustee did, the trustee got
9  all of the rights that that creditor had, including the
10 right to be paid.  And, therefore, you're out of luck,
11 junior union creditors.  You don't get to undo that.
12         Roach is also distinguishable.  The most important
13 distinguishing factor in Roach is that the debtor in that
14 case only sought to apply her exemption right to the
15 proceeds of the sale.  She did not resist effectively the
16 sale itself.  By the time it got to the Court of Appeal, the
17 sale had proceeded.  The new buyer owned the property.  The
18 debtor was dispossessed.  We're hoping that's not going to
19 be the circumstance in our case.
20         We are arguing that the trustee has absolutely no
21 right to sell Ms. Gallian's exempt interest in the property.
22 And I suspect that none of the buyers want to buy this
23 property subject to Ms. Gallian's exemption rights.
24         So that also brings us to Section 363, (d) I think
25 it is, that talks about selling free and clear of interests.

34

1   It is true, trustees have the right to sell certain

2   properties free and clear of various different types of

3   interests.  Exemption rights are not among them.  When you

4   read the five different categories of rights that a trustee

5   can sell free and clear of, exemption rights don't fall into

6   any of those five categories.  This is an argument made in

7   our opposition to which there was no response in the

8   replies, and no response in the arguments that have been

9   made by counsel in favor of the sale.

10          If the Court is to allow a sale of this property

11  free and clear of Ms. Gallian's exemption rights in

12  derogation of Section 363, this Court will be committing

13  reversible error.  We can avoid that problem.  The way to

14  avoid that problem is to deny the trustee's motion to sell.

15          We have this question of Ms. Gallian's claim

16  number 7.1 -- or 7-1.  I'm really not sure what the trustee

17  or his cohort wants to make of that.  To me, I read it, it's

18  confusing.  What I don't see is a note by which J-Sandcastle

19  agreed to pay any money to J Pad.  What I don't see if any

20  evidence that J Pad lent any money to J-Sandcastle.

21          If J Pad did not lend any money to J-Sandcastle,

22  this is no different than a lender who agrees to give

23  someone a line of credit, secures it with a deed of trust,

24  states a value in the deed of trust so that the world is on

25  notice to what the maximum amount of the line of credit may

35

1  get to, but then never funds the loan.  In that

2  circumstance, no debt is owed, no lien ever attaches to the

3  property.  And the fact that there was evidence of

4  perfection shows that, yes, there is a cloud on title, and

5  the cloud on title can be removed or avoided and preserved,

6  but it doesn't magically put money in the trustee's pocket

7  as a result of having avoided any preserved the deed of

8  trust.  Without a debt, there is no -- without a loan, there

9  is no debt, there is no attached lien.

10          I think it was Mr. Hays also suggests that

11  arguments that were made at the initial attempt by the

12  trustee to hire a broker somehow bind Ms. Gallian.  I don't

13  believe that that makes any sense at all.  First of all, the

14  question of whether or not a broker should be employed is

15  different than whether or not property should be sold.

16          Second of all, none of that was in the record of

17  the trustee's motion, and we haven't had an adequate

18  opportunity to respond to whatever Ms. Gallian may have said

19  back then.  But Ms. Gallian, as a layperson, is not

20  qualified to -- to make a statement about whether a lien

21  attached or whether a lien was perfected.  And all she has

22  done through her 14 or 13 or 12, whatever it is, iterations

23  of her schedules, is try to disclose to the Court what she

24  did.

25          And I understand, the Court looked at all of those

36

things and said, I think you are playing games, and I think
you are hiding stuff.  I look at it differently, but it
doesn't matter, that decision is done.  The Court has denied
the Debtor's discharge.  The Debtor's going to have to live
with that, and the Debtor will live with that.  But as I
mentioned at the top, the fact that someone's discharge has
been denied -- not revoked, but denied, is not grounds for
vitiating their exemption rights.

        I think I'd like to turn briefly to the stay
motion that I filed.  This is my first time ever having to
prepare, to ask a court to stay an order, so that it -- the
rights of my client would be preserved on appeal.  That's
right, in 40 years of practice, it's never occurred before.
I never had to do it before.  It wasn't easy to find a lot
of examples of how it's done.

        My understanding is that often when the ruling
goes against you, it's made by an oral motion.  To me that
seems too much of an imposition on the court to have to deal
with an oral motion for stay pending appeal without the
benefit of whatever authorities or arguments could be
brought.

        THE COURT:  Mr. Blank, are you referring to an
oral decision and not a motion?

        MR. BLANK:  An oral decision as opposed to an --

        THE COURT:  You've been saying -- you've been

37

1  saying you have to deal with an oral motion.  I haven't

2  heard any oral motions today.

3          MR. BLANK:  No.

4          THE COURT:  And I think you're referring to oral

5  decisions, but I wanted to make sure you're -- you're

6  correct.

7          MR. BLANK:  I'm sorry, your Honor.  Neither one is

8  correct.  What I'm referring to is why I filed what I did

9  yesterday at around 3:00 o'clock in the afternoon.

10         THE COURT:  You don't need to --

11         MR. BLANK:  I filed --

12         THE COURT:  -- you don't need to explain that.  I

13  understand why you did it.

14         MR. BLANK:  Okay.  It was to give the Court the

15  benefit of the argument that I would make if the Court were

16  to grant the motions, and to see it in writing as opposed to

17  having to deal with it orally.

18         Because if I hadn't filed it in writing, I would

19  be, if the Court were to grant this motion, the trustee's

20  motions, I would be asking for a stay pending appeal --

21         THE COURT:  Let me clarify that, too.  I would

22  have required you to file a motion.

23         MR. BLANK:  Okay.  Fair enough.  I'm learning.

24         I think the Court also mentioned and I'm aware,

25  that when someone files a notice of appeal before the

38

1  official order is actually entered, the typical way of

2  handling it is, to treat it as though it was filed

3  immediately after.  And I would request that the Court, if

4  it is inclined to enter an order approving either of the

5  trustee's motions, to treat the motion that I've filed as

6  having been filed immediately after.

7          I think at this point I would like to offer to

8  answer any questions the Court may have.  I think I've

9  addressed each of the arguments that the trustee and counsel

10 for creditors have made, and so I'm prepared to yield.

11         THE COURT:  Mr. Israel, would you like to respond?

12         MR. ISRAEL:  Yes, your Honor.  I'm back behind the

13 -- your Honor, I think most of what Debtor's counsel raised,

14 either I or Ed Hays has already addressed.  We completely

15 agree that the motion should be based on evidence.  That the

16 motion specifically said that it would be based on other

17 papers and adversary proceedings in this case.  Your Honor

18 can take judicial notice of all that, and we requested that

19 your Honor do that.

20         In terms of mediation, your Honor, the -- we have

21 a buyer here.  The trustee's gone to a lot of effort.  Now,

22 if your Honor grants this motion, the parties can still go

23 to mediation, if it's appropriate.  If there's going to be

24 an appeal, that's still an opportunity for a mediation.  But

25 it's really too late to suggest that we should stop

39

1 everything three-and-a-half years into this case and put

2 everything on hold to go to a mediation.  That's what I

3 would suggest.  And I'm all for mediations generally.  I'm a

4 mediator on the panel and I believe in the program.  So, the

5 trustee would not foreclose going after, but we'd like --

6 we're here.  We're -- you know, we've already used up over

7 an hour of your Honor's court time and the parties' time.

8          Your Honor, the trustee disagrees that the trustee

9 is somehow subject to the enforcement of judgment fact to

10 the extent it contradicts the bankruptcy code.  The

11 bankruptcy code is the law of the land, your Honor.  Section

12 363 provides for how a sale happens, and 542 talks about

13 turnover.

14          Your Honor, the trustee has met those elements.

15 The case law on exemptions does not provide, as Mr. Blank

16 has suggested, and I've e-mailed case authority that there's

17 a possessory right that somehow trumps, if you will, the --

18 the two code sections that I just addressed on sales and

19 turnover.  In fact, if anything, it's the opposite.  The

20 Debtor is required to cooperate.  The Debtor can be removed

21 from property if the Debtor doesn't cooperate.  Luckily we

22 didn't in the end have to go down that road, but -- let's

23 see.

24          The discussion about foreclosing on the J Pad lien

25 I've -- I addressed earlier.  There's no independent right

40

1  of redemption under the bankruptcy code.  The Debtor could

2  have overbid.  That's the procedure that's allowed under the

3  bankruptcy code.  The Debtor has chosen not to.

4          Your Honor, I discussed and so did Mr. Hays, this

5  argument about, well, there was no actual loan.  Your Honor,

6  her schedules say opposite under penalty of perjury.  The

7  proof of claim, claim number 7-1 that she filed in October

8  says there is a debt, says it is secured.  So she should be

9  estopped from continuing to make that argument.  There's the

10 judicial estoppel arguments that I raised earlier that's in

11 the papers.  All this is in the papers, that she raised the

12 issue before.

13         Your Honor denied the trustee's first employment

14 application for the broker as being premature.  We brought

15 an adversary proceeding.  We avoided all those liens.  We

16 come back, and now she says, there's no lien here.  There

17 was no loan.  That's not what her proof of claim says,

18 that's not what her schedules say.  Again, she should not be

19 able to benefit from her own fraud, and that's what Mr.

20 Blank is asking your Honor to allow her to do.

21         The Debtor attempts to distinguish Van De Kamp by

22 saying the debt -- that there was a debt, but it wasn't a

23 debt owing from the debtor.  Whether it was a debt owing

24 from somebody else, why is that relevant?  It's still a

25 fraudulent lien, either constructively fraudulent or actual

41

1  fraudulent -- actually fraudulent intent to hinder, delay

2  and defraud creditors.

3          We don't have -- I don't believe that's a material

4  distinguishing factor, your Honor.  Van De Kamp stands for

5  the proposition that you don't look behind it, and the same

6  should apply here to the trustee.  The -- that policy -- it

7  shouldn't be that creditors don't have to prove that there

8  was -- that there was an allowable claim, but the trustee

9  does.  It just doesn't make sense, your Honor.

10         Your Honor, counsel argues that there's no

11 evidence that J Pad loaned money.  We understand that's her

12 contention now.  That wasn't her contention in the 13

13 amended schedules before.  It wasn't the contention in the

14 proof of claim number 7-1.  It wasn't her contention in the

15 opposition to the trustee's first brokerage motion.  Again,

16 judicial estoppel, your Honor.  The Debtor's not allowed to

17 change positions to suit the needs of the particular relief

18 that's being requested at the moment.

19         Your Honor, I think that's pretty much what I

20 have.

21         THE COURT:  Mr. Israel, I, like you, apparently

22 made a very list, because I listened carefully to Mr. Blank

23 of the issues he raised.

24         Looking at the list that you may have created, or

25 I can remind you, how many of the points that Mr. Blank

42

1    articulately raised are subject to issue preclusion in this

2    particular case?

3            MR. ISRAEL:  Your Honor, I think whether there was

4    a debt and whether there was a lien and whether there was

5    title, all I think are barred by issue preclusion.  Some of

6    his arguments were legal arguments, your Honor.  But I think

7    the gist of his argument is that there is -- are two-fold.

8    One is that the trustee is not bound by -- or is bound by

9    the enforcement of judgments act to the extent it

10   contradicts the bankruptcy code, and the trustee vehemently

11   disagrees with that.

12           And the second is the effect of Section 551.  What

13   does it mean to avoid and preserve a lien?  He says that the

14   whole -- he argues that the whole property is exempt.

15   That's not what the cases say.  The Debtor gets an exemption

16   in whatever is behind consensual liens.  And here, she put

17   on a consensual lien.  It was fraudulent.  We avoided it.

18           And the trustee may use that lien and -- that and

19   the avoidance of title to sell the property and is entitled

20   to the proceeds that would be due under that lien, which

21   counsel says is zero, but the proof of claim that she filed

22   just in October says -- says exactly the opposite.  Says

23   there's an allowed secured claim she filed, signed it under

24   penalty of perjury, not subject to any setoffs.  That's what

25   -- that's a box she checked as well.  And now, four months

43

1   later, we're getting an argument to the contrary.  So I

2   think that, too, is issue preclusion.

3           THE COURT:  Thank you.

4           Mr. Hays, you would like to respond perhaps to Mr.

5   Blank's very articulate arguments?

6           MR. HAYS:  Yes, your Honor.  And I think I can

7   keep it short.

8           I think the Debtor's biggest argument is one that

9   attempts to escape the consequence as a Section 522(g).  She

10  relies very heavily and is voluntarily admitting that there

11  was no claim secured by this fraudulent lien.  And,

12  therefore, the trustee avoided, recovered and preserved

13  nothing.  And the trustee can't get anything because you

14  don't have a lien unless it secures a claim.

15          So that's the argument that they're making, but I

16  think it falls apart in a number of respects, and it's not

17  supported by the law.  You can't have a debtor fraudulently

18  place a lien on property to conceal her equity, and

19  collateral estoppel -- or issue preclusion I should say,

20  prevents the attempted -- any attempt at getting around the

21  very nature of this lien as being fraudulent.

22          The Court found it was fraudulent in denying

23  discharge.  The Court found it was fraudulent in granting

24  the judgment avoiding, recovering and preserving.  And so

25  the Debtor who is the fraudster here, is now trying to say,

44

1   well, I was using this lien to conceal my equity in the

2   property.  I scheduled it in my bankruptcy schedules under

3   penalty of perjury.  I asserted it in a proof of claim that

4   I filed with the Court.  I used it as grounds to oppose the

5   trustee's earlier attempt to employ a broker before the lien

6   was avoided, and the Court actually adopted that position by

7   denying the broker's employment back when it first occurred.

8   And this was at a hearing in September of 2022, and the

9   transcript from that hearing is on the docket at docket

10  number 524.  And on page 29 of 32 the Court says:

11              "I don't mind Mr. Bingham

12              (phonetic) and his agency being

13              employed.  What I do mind is getting

14              ahead of ourselves, and again, I'm just

15              simply trying to find out a few things,

16              including what is your game plan to

17              avoid the lien?"

18              And that was a question posed to the trustee, Mr.

19  Golden.  And so the transcript goes on, but at the end the

20  Court denies the motion by adopting the Debtor's position

21  that there is a lien on the property, and there is going to

22  be no benefit to the estate from selling that property

23  unless or until the lien can be avoided.

24              And so the Court adopted it.  And that's the basis

25  of judicial estoppel, is to take a position that the Court

45

1   adopts and then turn around and take a different position.

2   And that's what she's doing here now is that, well, that

3   lien really wasn't a lien because it secured nothing, and

4   that's just not the case.

5          And I echo Mr. Israel's comments about <u>Van De</u>

6   <u>Kamp</u>.  The attempt by Mr. Blank to distinguish it is a

7   distinction without a difference, vis-a-vis the Debtor, the

8   lien was purely fraudulent.  The Debtor had no liability on

9   this debt owed by its principal.  Therefore, when the

10  trustee avoided, recovered and preserved that lien, the

11  trustee got the benefit of it, which was a lien on the

12  Debtor's assets up to the amount stated in the lien, which

13  happened to be the amount that the Debtor's principal owed,

14  but it wasn't a debt that Debtor owed.

15         And so if you take Mr. Blank's argument to its

16  logical conclusion, and what they're actually arguing here

17  is that the Debtor can put a fraudulent lien on property and

18  face no consequences when it comes to the trustee having to

19  go avoid, recover and preserve, and to then escape the

20  application of 522(g), which says on its face, a debtor

21  cannot claim an exemption in property that a debtor

22  voluntarily transferred when the trustee recovers that

23  property.

24         And so here the trustee's avoided, recovered and

25  preserved this lien.  Fraudulent transfers under California

46

1   law are enforceable between transferor and transferee, and

2   now the Debtor wants to turn around and say, but I do want

3   to claim an exemption in this property the trustee

4   recovered, because all of the value of this property is

5   consumed by the fraudulent lien that the Debtor voluntarily

6   put against her property.

7           So she wants to escape the consequences of her

8   action and the application of 522(g).  There's no case law

9   that the Debtor has cited that allows her to do that and

10  that allows her to ignore the plain language of the

11  bankruptcy code.

12          I agree with Mr. Israel, the enforcement of

13  judgment law has no application here whatsoever.  And I

14  would comment -- I think the Court raised this comment, and

15  that is, the Debtor's exemption did not remove the entire

16  property from the estate.  The Debtor's exemption allowed

17  her a set dollar amount interest in the proceeds of

18  property, to the extent that there's any proceeds

19  attributable to that when you go through the priority.

20          The U.S. Supreme Court in Schwab v. Reilly made

21  this clear.  That claiming an exemption when there's a

22  dollar amount on the exemption doesn't remove the asset from

23  the estate.  And the asset remains in the estate, which is

24  the case here.

25          This property is property of the bankruptcy

47

estate, and the trustee can sell it, and then the proceeds

will go to the lienholders first, because consensual liens

have priority over exemptions.  Here, it happens that the

trustee is now standing in the shoes of this consensual

lienholder, and the trustee can get the benefit of the

proceeds otherwise subject to this lien.

And so in the end, the enforcement of judgment law

has no application, and there's no case cited by the Debtor

that says a trustee cannot use 363 powers to sell an asset

in order to realize the benefit of an avoided, recovered and

preserved lien, which is exactly what we are doing here.

THE COURT:  Well, one thing's for certain, none of

the arguments made, all articulate, would be active if we

didn't have a potential buyer.

Mr. Israel, would you or Mr. Golden like to

conduct an auction?

MR. BLANK:  Your Honor --

THE COURT:  Excuse me, Mr. Blank.  Let me ask Mr.

Israel my question before you interrupt me.

MR. ISRAEL:  Yes, your Honor.  The trustee's there

in person, so I don't know if he wants to do it.  I'm happy

to do it if -- if he isn't.  I just can't turn -- turn down

the isle and ask him.

THE COURT:  Well, is Mr. Golden available at the

lectern?

48

1          MR. GOLDEN:  Yes, your Honor.

2          THE COURT:  Mr. Golden, my point earlier was, if

3    we don't have a buyer today, none of the arguments are

4    relevant.  And, therefore, I think we need to proceed to an

5    auction to see if there's even a buyer.  And if there is a

6    buyer, then we can rule on the motion, and that would be

7    approving the sale.  But let's find out if there's a buyer.

8    Please conduct an auction, one of you.

9          MR. GOLDEN:  Yes, your Honor.  I'll proceed

10   unless, Mr. Israel, you want to.

11         Mister -- your Honor, just to -- we have a bid

12   from Mr. Peplin for 267 -- two-hundred-and seventy-six-

13   thousand dollars.  That was an overbid following the initial

14   bid of $275,000 in favor of the initial buyer who is also

15   present -- well, both of whom are present.

16         So I would ask, given the overbid, which met the

17   requirement of a $1,000 increment, I would actually turn to

18   the original stalking horse bidder to see whether or not he

19   is present for an overbid, your Honor.

20         THE COURT:  Well, Mr. Golden, you can turn to

21   anybody, not just him.  If Mr. Blank wants to bid, he can

22   bid, too.

23         MR. GOLDEN:  You're correct, your Honor.  I

24   apologize.

25         Is anyone interested in making a bid in the amount

*Briggs Reporting Company, Inc.*

49

1  of $277,000 or higher for the property that was ascribed in

2  the notice with the legal description contained within the

3  notice as well?

4           MR. BLANK:  Your Honor, may I ask a question just

5  to clarify the procedure that we're going through right now?

6           THE COURT:  It's an auction.  How can I help you?

7           MR. BLANK:  Okay.  So, if I'm understanding

8  correctly, the Court has not yet ruled on the motion --

9           THE COURT:  That's right.  And let me --

10          MR. BLANK:  -- trying to find out if -- if they're

11 still interested in buying, is that correct?

12          THE COURT:  -- and let me explain why.  Because

13 everything is moot if there's no buyer.

14          MR. BLANK:  Right.

15          THE COURT:  Okay.  So do you understand that, Mr.

16 Blank?

17          MR. BLANK:  I think so.  And then perhaps the

18 first question should be, has the stalking horse bidder or

19 Mr. Peplin, either one of them decided to withdraw their

20 offers?

21          THE COURT:  Well, we'll find out, Mr. Blank.  Quit

22 interrupting us.

23          MR. GOLDEN:  Is anyone interested in the bid of

24 $277,000 or higher?  Galaxy is not interested, I assume?

25          MR. HERR:  It's my understanding that the

50

1   overbidder is approved for tenancy of the parcel.  I will

2   acquiesce to the overbidder.

3          MR. GOLDEN:  Well, I heard part of that, that you

4   were going to acquiesce to the overbidder.

5          So at that point, your Honor, I haven't heard any

6   bid over 276,000.  Mr. Peplin, your bid of $276,000, which

7   you tendered the deposit and provided financial

8   qualifications, that bid is still outstanding, correct?

9          MR. PEPLIN:  Yes, sir.

10         MR. GOLDEN:  and I've heard no higher bid from

11  either Galaxy or anyone else as of this point, your Honor,

12  so I think that unless anyone else is interested now, I

13  think that the bidding may be concluded or is concluded.

14         THE COURT:  It sounds like to me that the auction

15  has been concluded.  Mister -- thank you, Mr. Golden.

16         Mr. Israel, are you requesting court approval for

17  the sale?

18         MR. ISRAEL:  Yes, your Honor.  We're requesting

19  court approval of the motion including -- and approval of

20  the auction and the -- at the price of $276,000 to Mr. Greg

21  Peplin.

22         THE COURT:  Okay.  Would anyone like to add

23  anything else, other than repeating arguments?  If not,

24  the --

25         MR. BLANK:  Your Honor, Ms. Gallian is wondering

51

1  whether she would be allowed to bid her exemption rights?

2          MR. ISRAEL:  Your Honor, the trustee would object

3  to that.  There was a qualification procedure in the motion

4  to bid.  Bids were due three days ago with a deposit, all

5  cash, and that's not what Mr. Blank is proposing.

6          THE COURT:  Well, the Court won't permit anyone to

7  come in who is not qualified who doesn't pay cash.  Two-

8  hundred-and-seventy-six-thousand dollars seems to be the

9  correct and final bid.  Is that correct, Mr. Israel?

10         MR. ISRAEL:  Yes, your Honor.

11         THE COURT:  Okay.  Well, this is what the Court's

12 going to do.  The court taking Items Number Two and Three

13 under submission.

14         Mr. Blank, you have the opportunity to file

15 proposed findings of fact and conclusions of law to be

16 submitted to the Court by no earlier -- no later than 5:00

17 p.m. Pacific, March 7, that's this Friday, on -- related to

18 your positions.

19         Mr. Israel, you have until the same time and date

20 to file proposed findings of facts and conclusions of law on

21 the issues with respect to both Items Number Two and Three

22 on today's calendar, and the Court will take a look at that.

23         Mr. Hays, did you want to send anything in, or

24 would you like to just work with -- as Mr. Blank called him,

25 your "cohort"?

52

1          MR. HAYS:  Your Honor, we will work with Mr.

2    Israel and submit a single set of proposed findings.

3          THE COURT:  Okay.  With respect to Mr. Blank's

4    request for a stay pending appeal, I'll consider a stay

5    pending appeal, and I'll schedule a hearing on it after --

6    if it's necessary after reading -- I want to read your

7    proposed findings of facts and conclusions of law, Mr.

8    Blank.  And, therefore, it's slightly premature to even set

9    a hearing, but it's an active motion, and we're going to set

10    that in abeyance.

11          Now, Mr. Israel and Mr. Hays and any -- and Mr.

12    Goe, and anyone else who's interested, you may reply to that

13    stay pending appeal, if you so desire, before this Court

14    rules or after this Court rules, but we're not going to be

15    having a hearing on a stay pending appeal on a decision that

16    has not yet been made.  And so what we'll do is wait for

17    that.

18          So, I will find an appropriate date and time to

19    hear the pending motion for stay pending appeal, if it's

20    necessary.  And also I'm ordering the clerk of the court to

21    place this transcript recording on to the docket, so that

22    everyone can have access to it.  I'm not sure if all of you

23    are not familiar with our system now, but we are able to put

24    audio recordings directly on to our court docket, and be

25    able to have anyone download those and listen to them as

53

1  audio files.

2          And so you cannot rely on those as official

3  transcripts.  You have to order a transcript, if you want a

4  transcript, but the fact is, it's available for listening --

5  your listening pleasure.  So there you have that.

6          I will be waiting for the March 7, 5:00 p.m.

7  deadline, proposed findings of facts and conclusions of law,

8  which I hope are extensive.  And you may address all the

9  pleadings that have been in this case, all of the evidence

10  that has been provided in this case, and specifically even

11  the arguments made by Mr. Blank in his motion for stay

12  pending appeal, which I've considered it as a duplicate or a

13  improper surreply, but I'm going to waive the court rules

14  and allow that to be considered, too.

15          Is there anything else I can help anyone out with

16  with respect to this sale or the turnover motion?

17          MR. ISRAEL:  Yes, your Honor.  Can I -- can I ask

18  for some clarification?  On the consideration of the

19  surreply, since there will be a separate motion for a stay,

20  if the Court grants the trustee's motion, does your Honor

21  want those elements -- a discussion of the elements for stay

22  pending appeal in the findings of fact and conclusions of

23  law, or we should wait?

24          THE COURT:  No, you should wait.

25          MR. ISRAEL:  Wait.  Okay.

*Briggs Reporting Company, Inc.*

54

1          THE COURT:  and I think you slightly

2  misinterpreted my finding.  I'm going to consider the motion

3  as a motion for stay pending appeal.  And it may end up

4  being moot because the Debtor may prevail in this.  But

5  we're not going to have the Debtor have to re-file a motion

6  for stay pending appeal.  That's his stay pending appeal --

7  that's her stay pending appeal.  And when I set the hearing

8  date I will give times for opposition.

9          MR. ISRAEL:  Okay.

10          THE COURT:  Very good.

11          MR. BLANK:  Understood.

12          THE COURT:  Is there anything else I can help

13  anyone out with?

14          MR. HAYS:  Your Honor, one -- one housekeeping

15  issue I think is, the motion for sale did ask the Court to

16  make a finding of good-faith purchaser.  And I know that the

17  successful bidder at the auction today, subject to the Court

18  granting a motion, is the person who recently stepped in as

19  the qualified overbidder.

20          So would the Court like the trustee or trustee's

21  counsel to briefly inquire of the successful bidder on the

22  record, or just put that into a supplemental declaration

23  that gets filed with the proposed findings?

24          THE COURT:  A supplemental declaration would be

25  the appropriate way.

55

1          MR. HAYS:  Very good.  Thank you, your Honor.

2          THE COURT:  All right.

3          MR. ISRAEL:  And when would your Honor like the

4  supplemental declaration?  After --

5          THE COURT:  Before I can make my ruling, I'll have

6  to see that if I make a ruling in the trustee's favor.  And

7  I won't be making that ruling until after 5:00 p.m. on March

8  7.  So I would probably put it in anytime between now and

9  March 10th.

10          MR. ISRAEL:  Will do, your Honor.

11          THE COURT:  Anything else?  All right.  Court is

12  in recess until 1:30.  Thank you very much.

13          ALL PARTIES:  Thank you, your Honor.

14      (Proceedings concluded.)

15

16

17          I certify that the foregoing is a correct

18  transcript from the electronic sound recording of the

19  proceedings in the above-entitled matter.

20

21  /s/ Holly Steinhauer          5-20-25
    Transcriber                   Date
22

23

24

25

1                  UNITED STATES BANKRUPTCY COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                           --oOo--

4  In Re:                        ) Case No. 8:21-bk-11710-SC
                                 )
5  JAMIE LYNN GALLIAN,           ) Chapter 7
                                 )
6           Debtor.              ) Santa Ana, California
   _____) Thursday, March 27, 2025
7                                  10:00 a.m.

8                                CONT'D HEARING RE: TRUSTEE'S
                                 MOTION TO AUTHORIZE SALE OF
9                                MANUFACTURED HOME CURRENTLY
                                 LOCATED AT 16222 MONTEREY
10                               LANE, SPACE 376, HUNTINGTON
                                 BEACH, CA 92649, DECAL NO.
11                               LBM1081, FREE AND CLEAR OF
                                 LIENS AND HOMESTEAD EXEMPTION

12

13                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE SCOTT CLARKSON
14                UNITED STATES BANKRUPTCY JUDGE

15  APPEARANCES:

16  For the Debtor:              CHRISTOPHER L. BLANK, ESQ.
                                 Christopher L. Blank, PC
17                               2973 Harbor Boulevard
                                 Suite 506
18                               Costa Mesa, California 92626
                                 (714) 856-4626
19

20  For the Chapter 7 Trustee:   ERIC P. ISRAEL, ESQ.
                                 Levene, Neale, Bender, Yoo &
21                                 & Golubchik, LLP
                                 2818 La Cienega Avenue
22                               Los Angeles, California 90034
                                 (310) 229-1234
23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1    APPEARANCES:  (cont'd.)

2    For the Chapter 7 Trustee:        JEFFREY I. GOLDEN, ESQ.
                                       Golden Goodrich, LLP
3                                      3070 Bristol Street
                                       Suite 640
4                                      Costa Mesa, California 92626
                                       (714) 966-1000
5

6    For Creditor Houser Bros.         D. EDWARD HAYS, ESQ.
       dba Rancho Del Rey              Marshack, Hays & Wood, LLP
7      Mobile Home Estates:            870 Roosevelt
                                       Irvine, California 92620
8                                      (949) 333-7777

9    For Greg Peplin:                  LORI ALVAREZ, REAL ESTATE
                                         BROKER
10

11   Court Recorder:                   James Le
                                       United States Bankruptcy Court
12                                     411 West Fourth Street
                                       Suite 2030
13                                     Santa Ana, California 92701

14   Transcriber:                      Briggs Reporting Company, Inc.
                                       9711 Cactus Street
15                                     Suite B
                                       Lakeside, California 92040
16                                     (310) 410-4151

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

1

1    <u>SANTA ANA, CALIFORNIA   THURSDAY, MARCH 27, 2025   10:00 AM</u>

2                              --oOo--

3        (Call to order of the Court.)

4              THE CLERK:  All rise and come to order.  This

5    United States Bankruptcy Court is now in session.  The

6    Honorable Scott C. Clarkson, presiding.

7              THE COURT:  Please be seated and welcome.

8              UNIDENTIFIED SPEAKER:  Good morning, your Honor.

9              THE COURT:  This is the March 27, 2025 10:00

10   o'clock calendar.  Let's -- first of all, we're not going to

11   call you yet, sir.

12             Let's call Item Number Four -- or zero -- .04 in

13   the Gallian matter.  This is the trustee's motion to

14   authorize a sale of manufactured homes -- or a home.

15             May I have appearances, please?

16             MR. ISRAEL (via Zoom):  Good morning, your Honor.

17   Eric Israel of Danning -- of Levene, Neale, Bender, Yoo and

18   Golubchik, attorneys for the trustee.  And trustee's also

19   present on Zoom.

20             THE COURT:  Good morning, sir.

21             MR. BLANK (via Zoom):  Good morning, your Honor.

22   Christopher Blank, B-L-A-N-K, on behalf of the Debtor.  The

23   Debtor is present with me in my office.

24             THE COURT:  Good morning to you.

25             MR. HAYS (via Zoom):  And good morning, your

2

1   Honor.  For creditor Houser Bros., this is Ed Hays of

2   Marshack, Hays, Wood, LLP.

3           THE COURT:  Thank you.

4           Are there other appearances?

5           MR. PEPLIN (via Zoom):  Yeah.  Good morning.  Greg

6   Peplin, the overbidder.

7           THE COURT:  Hello, Mr. Peplin.

8           MR. PEPLIN:  Hello.

9           MR. GOLDEN (via Zoom):  Good morning, your Honor.

10  Jeffrey Golden, Trustee.

11          THE COURT:  Hello, Mr. Golden.

12          Anyone else?  Today we are having an auction.

13  That's all we're having.  We're not discussing any other

14  matter.  We're just doing the auction.

15          Mr. Golden, are you going to be conducting the

16  auction?

17          MR. GOLDEN:  Yes, I can, your Honor.  May I

18  proceed?

19          THE COURT:  Please.

20          MR. GOLDEN:  Although I may turn some of this over

21  to Mr. Israel.

22          Your Honor, well, first of all, we did not receive

23  -- just to advise the Court.  We did not receive any timely

24  overbidders in -- prescribed with the procedures that we had

25  set out.  So, any overbidder that was here may have some

3

1    issues with the guidelines.  But I'd like to call out, if I

2    could at this time, to find out if in fact there are any

3    overbidders in the courtroom or on the -- or on Zoom?  I

4    apologize.

5            MR. PEPLIN:  I don't know if you're including me,

6    Greg Peplin, but I'm an overbidder that's known.

7            THE COURT:  Mr. Golden, it appears to me that the

8    motion still has an initial stalking horse bidder.  Has that

9    bidder withdrawn?

10           MR. GOLDEN:  Your Honor, I'm going to -- I'm going

11   to ask my counsel.  It's my understanding is they have not

12   formally withdrawn.  But if you don't mind, I'd like to

13   defer to my counsel to see if he has different information.

14           MR. ISRAEL:  Yes, your Honor.  Your Honor, the

15   original bidder has not advised us that he is backing out.

16   We asked that he be present, and I don't know if he is.  It

17   looks like he might not be.

18           THE COURT:  Well, let me point out --

19           MR. ISRAEL:  He wasn't --

20           THE COURT:  -- that all this is is the actual

21   auction based upon the motion that we undertook, and I ruled

22   that we would proceed for an auction.  So, if he hasn't

23   withdrawn, he hasn't withdrawn.

24           Mr. Golden, you have a stalking horse bidder,

25   correct?

4

1          MR. GOLDEN:  Yes, your Honor.

2          THE COURT:  Conduct an auction.

3          MR. GOLDEN:  Your Honor, I'm having some problems

4  electronically right now accessing my files.  Can I ask Mr.

5  Israel to do that?

6          THE COURT:  You can ask --

7          MR. ISRAEL:  I'd be happy to, your Honor.

8          THE COURT:  -- anybody that you want to, including

9  Mr. Blank, to conduct an auction.

10         MR. GOLDEN:  If I could ask Mr. Israel, just

11 because I'm -- I'm in a different courtroom, and I

12 apologize, your Honor.

13         THE COURT:  You understood that this was going to

14 happen today, right, Mr. Golden?

15         MR. GOLDEN:  Yes, your Honor, I did --

16         THE COURT:  And are you prepared to go forward?

17         MR. GOLDEN:  Yes, your Honor.

18         THE COURT:  Well, go forward.

19         MR. ISRAEL:  Your Honor, I'd like to state that

20 the sale is of a 2014 Skyline Custom Villa, decal number

21 LBM1081, currently located at 16222 Monterey Lane, Space

22 376, Huntington Beach, California.  The sale is as-is,

23 where-is, with no warranty or recourse whatsoever.  Anyone

24 bidding acknowledges that he or she has read the sale motion

25 and agrees to be bound by all its terms except as to price.

5

1  Bidding is all cash with no contingencies.  The sale does

2  not include the pad where the property is presently located,

3  although the park advises that it will issue a new ground

4  lease to a qualified bidder but not the Debtor.

5          Your Honor, the -- Mr. Peplin has submitted an

6  overbid under -- and qualified with the procedures that are

7  set forth in the sale motion.  The overbid is for $276,000.

8  I would call and -- call for any overbids above 276.  The

9  minimum increment is $1,000.

10          Is anyone in the court or on the phone -- on Zoom

11  prepared to bid $277,000?  Anyone?  Going once, going twice.

12  Your Honor, the trustee would request that your Honor

13  confirm the sale to Greg Peplin for $276,000.

14          THE COURT:  Would you like a 363(m) finding?

15          MR. ISRAEL:  Yes, your Honor.  And, your Honor, I

16  did submit declarations in order to comply with your Honor's

17  order vacating the March 4th auction and re-setting it --

18  the auction for now.  I submitted a declaration for Mr. Greg

19  Peplin.  I submitted a declaration from Greg Bingham, who is

20  the trustee's broker.  I submitted a declaration as well

21  from Ms. Lori Alvarez (phonetic), who is on the Zoom as well

22  with us.  She is the broker who is representing Mr. Peplin.

23          THE COURT:  How have you proposed to address the

24  Court's concerns with respect to the last auction?

25          MR. ISRAEL:  Your Honor, the -- we submitted those

6

declarations.  There were no untoward communications.  Mr.
Peplin's declaration states that he actually never signed a
listing agreement with Galaxy and terminated that
representation after receipt of the Court's order.  And --
so there's no longer a dual representation.  Again, it was
not dual with the trustee.  This is between the original
bidder and -- or offer or stalking horse buyer and the
overbidder, Mr. Greg Peplin.  So there are no longer any
dual representations.

We've -- we believe we've fully disclosed
everything that we're aware of in terms of communications
between any buyer and any broker that was involved.  So just
to be clear, the brokers would be Coldwell Banker through
Greg Bingham, and Bill Freedman (phonetic) for the seller
for the trustee, subject to court approval.  And the buyer,
Greg Peplin, being represented by Ms. Lori Alvarez, who is
again they're -- both brokers are in attendance.

THE COURT:  Would anyone like to address the
proposed 363(m) finding?

MR. BLANK:  Yes, your Honor, I would.

THE COURT:  Please proceed.

MR. BLANK:  So, your Honor, my understanding is
the point of the 363(m) analysis is to -- to figure out if
there has been spirited bidding, or if there's any evidence
that there is perhaps collusion or something that would have

7

1  chilled bidding, and, therefore, not raise the best price

2  that could be obtained for the asset being sold.

3          And what we have here according to the

4  declarations is a situation where the overbidder hired the

5  stalking horse bidder to be his broker.  And I think by

6  definition, that's likely to chill bidding because it makes

7  it so that the stalking horse bidder would be violating a

8  duty to his own client if he then tried to bid the price up.

9          And I don't think that that is necessarily fixed

10  simply by firing that broker and hiring a different broker.

11  I think the fiduciary --

12          THE COURT:  Well, we didn't do that.  We cancelled

13  the auction, and the events of the auction.  Not only did

14  anyone get fired or leave representation, but I need to let

15  you understand that the order that I issued actually vacated

16  the auction.

17          MR. BLANK:  I understood that.

18          THE COURT:  Well, it's not what you're saying.

19          MR. BLANK:  No, that -- I'm sorry, your Honor, if

20  I'm not being clear.

21          THE COURT:  Well, you're talking about history.

22  We're talking about today's auction.

23          MR. BLANK:  Okay.  So what we have --

24          THE COURT:  Let's talk about today's auction and

25  why -- if you do, why do you oppose a 363 finding with

8

1  respect to today's auction?

2       MR. BLANK:  So, I went into the history because

3  it's my contention, your Honor, that having hired the

4  stalking horse bidder as his broker, the fact that he

5  subsequently supposedly dismissed that broker, even though

6  we don't have anything in writing indicating that he did

7  dismiss that broker.  All we have is his declaration that

8  says he did, and then we have Ms. Alvarez' declaration that

9  says that her representation is contingent on a written

10 waiver of the prior representation, and we don't have that.

11       So, it's my contention, your Honor, that having

12 hired the stalking horse bidder as his broker to begin with,

13 the fact that he subsequently dismissed that broker did not

14 relieve them of their fiduciary duties to him that obtained

15 when he hired them.

16       And I think that the fact that they're not even

17 present for this auction suggests that there is not spirited

18 bidding.

19       THE COURT:  Well, it may suggest that he doesn't

20 want to bid anything more than an overbid.

21       MR. BLANK:  Understood, your Honor.

22       THE COURT:  Good.  What evidence do you have that

23 the -- I'm talking about real evidence now, that the parties

24 do not meet the requirements of 363(m)?

25       MR. BLANK:  Well, I'll point out, your Honor,

9

1    that you offered the trustee and the bidders the opportunity

2    to submit declarations that explain their relationships.

3    You did not offer the Debtor and me the opportunity to

4    submit evidence that suggested otherwise.

5            THE COURT:  Well, you submitted --

6            MR. BLANK:  And if you'd like --

7            THE COURT:  -- a bunch of other things last night

8    or yesterday or two days ago.  You don't seem to have a

9    problem of filing things.  Do you have any evidence today --

10           MR. BLANK:  I know how to file things, your Honor.

11           THE COURT:  -- do you have any evidence today that

12   the 363 finding is -- (m) finding is inappropriate?  That's

13   what I'm asking you.  It's a direct question.  I would like

14   a direct answer.

15           MR. BLANK:  My direct answer is that I would like

16   the opportunity, if you will allow it, to submit evidence in

17   writing.

18           THE COURT:  You --

19           MR. BLANK:  I did not come --

20           THE COURT:  What evidence do you have right now,

21   Mr. Blank?

22           MR. BLANK:  I have none that I can submit to you

23   right now.  I would --

24           THE COURT:  Thank you.

25           MR. BLANK:  -- tell you --

10

1         THE COURT:  Thank you.

2         MR. BLANK:  -- that I think that the evidence --

3         THE COURT:  Do you have anything -- Mr. Blank, do

4  you have anything else?  I don't want to argue about this.

5  I --

6         MR. BLANK:  The evidence.

7         THE COURT:  -- I don't have to win an argument

8  here.  I'm just telling you -- I've asked if you if you have

9  any evidence to counter the evidence that's before the

10  Court.  Do you have any, and you answered, no.  Based upon

11  that, I'm going to make the 363(m) finding.

12         Is there anything else that I can help anyone out

13  with?

14         MR. BLANK:  Your Honor, I just want to make the

15  record that you have not allowed me a fulsome opportunity to

16  present evidence.  And that I have asked for that

17  opportunity and you have denied it.

18         THE COURT:  Do you have any evidence?

19         MR. BLANK:  And I have more to say, and yet you

20  have cut me off and told me --

21         THE COURT:  Yes, Mr. Blank.  I have a very busy --

22         MR. BLANK:  -- that you're the one with the gavel,

23  which I understand.

24         THE COURT:  Mr. Blank, I have a very busy calendar

25  today.  And I understand that you file things without

11

1  permission, without leave of court constantly.  And I'm

2  asking you one more time, do you have any evidence that you

3  can tell me you have with respect to countering the evidence

4  that this Court has with respect to a 363(m) finding?

5          MR. BLANK:  My contention is, your Honor --

6          THE COURT:  That's not a contention.

7          MR. BLANK:  -- that the evidence that the Court --

8          THE COURT:  Do you have any evidence?

9          MR. BLANK:  The evidence that is already before

10 the Court I believe contradicts what the Court is saying

11 about granting a 363(m) finding.

12         THE COURT:  Thank you very much.

13         MR. BLANK:  That's the evidence.

14         THE COURT:  Thank you very much.  Anything else?

15         MR. BLANK:  No.

16         THE COURT:  Mr. Israel, do you have anything?

17         MR. ISRAEL:  No, your Honor.  The -- we stand --

18         THE COURT:  I wouldn't -- Mr. Israel, I wouldn't

19 let this record sit.  Do you have anything?

20         MR. ISRAEL:  Your Honor, I -- the declarations we

21 submitted we believe fully disclose that Mr. Peplin is a

22 good-faith purchaser.  That there is no -- there was no

23 collusion.  363(m) is based on a finding of no bad faith.

24 So -- or, well, it's really good faith, but you prove it by

25 establishing the absence of bad faith.  There is no bad

12

1  faith here, your Honor.

2          This property's been marketed for months.  This is

3  -- the standard isn't whether there's spirited overbidding,

4  but was it exposed properly to the market, and it was.  It

5  was exposed for quite some time, and this is the -- this is

6  now the highest offer that we have received.  So with all

7  that, your Honor, we believe that your Honor has an ample

8  record for a 363(m) finding.

9          There's no -- I think the Court can make a finding

10 that there was good faith here, and there's a absence of bad

11 faith.  There's nothing that was done to chill bidding here.

12 It was put back up on the market, by the way, after your

13 Honor's order vacating.

14          We -- it was -- I offered the declaration of Greg

15 Bingham about -- that it was put back in the MLS under the

16 category "active" under contract, which is the property way

17 to do it.  I filed a three -- a rule -- what is it, 6004

18 notice of the auction -- new auction time and all the terms.

19          Your Honor, we -- the trustee believes he's done

20 everything he needs to, and that Mr. Blank has had ample

21 opportunity to conduct discovery.  As your Honor said, he's

22 filed numerous pleadings, one 36 hours ago.  And he has had

23 plenty of opportunity.  Mr. Peplin has been a known quantity

24 since before the March 4th auction.  And there was plenty of

25 opportunity to conduct discovery, if he needed to, or file

13

1 any declarations he needed to, and he hasn't.

2          THE COURT:  Well, I'll give Mr. Blank --

3          MR. ISRAEL:  So there is no evidence --

4          THE COURT:  -- another -- this is Thursday.  I'll

5 give him until next Tuesday at 5:00 o'clock to file any

6 further evidence that he might have that would contradict

7 your assertions, Mr. Israel, and the trustee's assertions

8 that -- that a 363(m) finding is improper.

9          With that, thank you very much.  We'll take this

10 under submission.

11          MR. BLANK:  Thank you, your Honor.

12          MR. ISRAEL:  Thank you, your Honor.

13          MR. GOLDEN:  Thank you, your Honor.

14     (Proceedings concluded.)

15

16

17          I certify that the foregoing is a correct

18 transcript from the electronic sound recording of the

19 proceedings in the above-entitled matter.

20

21 /s/ Holly Steinhauer          5-20-25
   Transcriber                   Date

22

23

24

25

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4   In Re:                        ) Case No. 8:21-bk-11710-SC
                                   )
5   JAMIE LYNN GALLIAN,            ) Chapter 7
                                   )
6           Debtor.               ) Santa Ana, California
    _____) Thursday, April 10, 2025
7                                    9:30 a.m.

8                                    EVIDENTIARY HEARING RE: FOR
                                     INTERESTED PARTIES TO PROVIDE
9                                    FURTHER EVIDENCE IN SUPPORT OR
                                     OPPOSITION TO A DETERMINATION
10                                   OF A SECTION 363(m) FINDING
                                     WITH RESPECT TO THE SUCCESSFUL
11                                   BUYER OF MANUFACTURED HOME
                                     LOCATED AT 16222 MONTEREY
12                                   LANE, SPACE 376, HUNTINGTON
                                     BEACH 92649, DECAL NO. LMB1081

13

14                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE SCOTT CLARKSON
15                   UNITED STATES BANKRUPTCY JUDGE

16  APPEARANCES:

17  For the Debtor:              CHRISTOPHER L. BLANK, ESQ.
                                 Christopher L. Blank, PC
18                               2973 Harbor Boulevard
                                 Suite 506
19                               Costa Mesa, California 92626
                                 (714) 856-4626
20

21  For the Chapter 7 Trustee:   ERIC P. ISRAEL, ESQ.
                                 Levene, Neale, Bender, Yoo &
22                                 & Golubchik, LLP
                                 2818 La Cienega Avenue
23                               Los Angeles, California 90034
                                 (310) 229-1234
24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

```
                                                                    ii

 1   APPEARANCES:  (cont'd.)

 2   For the Chapter 7 Trustee:    JEFFREY I. GOLDEN, ESQ.
                                   Golden Goodrich, LLP
 3                                 3070 Bristol Street
                                   Suite 640
 4                                 Costa Mesa, California 92626
                                   (714) 966-1000
 5

 6   For Creditor Houser Bros.     D. EDWARD HAYS, ESQ.
      dba Rancho Del Rey           BRADFORD N. BARNHARDT, ESQ.
 7    Mobile Home Estates:         Marshack, Hays & Wood, LLP
                                   870 Roosevelt
 8                                 Irvine, California 92620
                                   (949) 333-7777
 9

10   For Houser Bros:              CHRIS HOUSER, CREDITOR

11   For Greg Peplin:              LORI ALVAREZ, REAL ESTATE
                                     BROKER
12

13   Court Recorder:               Tamika Law
                                   United States Bankruptcy Court
14                                 411 West Fourth Street
                                   Suite 2030
15                                 Santa Ana, California 92701

16   Transcriber:                  Briggs Reporting Company, Inc.
                                   9711 Cactus Street
17                                 Suite B
                                   Lakeside, California 92040
18                                 (310) 410-4151

19

20

21

22

23

24

25
```

iii

1                          I N D E X

2  WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

3  Gregory Peplin           --       20       21        --

4

5  EXHIBITS                        IDENTIFIED    RECEIVED

6  (None.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    SANTA ANA, CALIFORNIA  THURSDAY, APRIL 10, 2025  9:30 AM

2                         --oOo--

3        (Call to order of the Court.)

4            THE COURT:  All right.  We're moving on to Item

5    Number One.  And let me get my paperwork straightened out

6    here.

7            This is the evidentiary hearing for interested

8    parties to provide further evidence in support or opposition

9    of a determination of the Section 363(m) finding.

10            May I have appearances, please?

11            MR. ISRAEL:  Good morning, your Honor.  Eric

12    Israel of Levene, Neale, Bender, Yoo and Golubchik, LLP,

13    attorneys for the trustee.

14            THE COURT:  Good morning.

15            MR. GOLDEN:  Good morning, your Honor.  Jeffrey

16    Golden, Trustee.

17            THE COURT:  Hello, Mr. Golden.

18            MR. HAYS:  Good morning, your Honor.  For creditor

19    Houser Bros., Ed Hays and Brad Barnhardt of Marshack, Hays,

20    Wood, LLP.

21            THE COURT:  Hello, Mr. Hays.

22            MR. BLANK:  Good morning, your Honor.  Christopher

23    Blank, B-L-A-N-K, on behalf of the Debtor.

24            THE COURT:  Good morning, Mr. Blank.

25            All right.  One second, please.

*Briggs Reporting Company, Inc.*

2

1        Mr. Israel, would you like to present evidence

2   with respect to your assertion -- your client's assertion

3   that the purchaser on March 25th, I believe, or 27th --

4        MR. ISRAEL:  Seven.

5        MR. BLANK:  27th, I think.

6        THE COURT:  -- 27th, was a good-faith purchaser in

7   accordance with Section 363(m).

8        MR. ISRAEL:  Yes, your Honor.  I believe the

9   trustee's evidence has all been filed and has been admitted.

10  Other than the recent declaration of Chris Houser, simply to

11  authenticate the current rules for the park and the park's

12  approval of Mr. Peplin and his wife as future tenants, the

13  trustee has not offered any new evidence.  As such, I

14  believe the ball is in Ms. Gallian's court, so to speak, to

15  cross-examine the trustee's witnesses, to the extent she

16  chooses to do so.

17        Present are the trustee, Mr. Peplin --

18        THE COURT:  Can you do me a favor?

19        MR. ISRAEL:  Yes.

20        THE COURT:  Associate your recitation of who's

21  here with the docket number of the appropriate declaration.

22        MR. ISRAEL:  Yes.  Okay.

23        THE COURT:  And I needed to ask, are there any

24  parties here appearing by Zoom?  Apparently not.

25        MR. ISRAEL:  I don't think so.  Your Honor, Mr.

3

1   Golden's declaration is at docket 539.  It was attached to

2   the original sale motion.

3           THE COURT:  Thank you.

4           MR. ISRAEL:  Your Honor, there were two

5   declarations from Greg Bingham.  The first is also attached

6   to 539, his original declaration.  There was a --

7           THE COURT:  And do me a favor.  Spell names for

8   the record.

9           MR. ISRAEL:  Certainly.  The trustee's name, too?

10  Golden, G --

11          THE COURT:  G-O-L-D-E-N.

12          MR. ISRAEL:  "G-O-L-D-E-N."  Bingham, Greg

13  Bingham, B-I-N-G-H-A-M.

14          THE COURT:  Thank you.

15          MR. ISRAEL:  So, in addition to docket 539, the

16  original sale motion, there was a supplemental declaration

17  of Mr. Greg Bingham, which is docket number 560.  And

18  another supplemental declaration, which is docket 578.

19          THE COURT:  Okay.

20          MR. ISRAEL:  In addition, we have the first

21  declaration of Greg Peplin, P-E-P-L-I-N.  He is the

22  overbidder that was the high bidder at the second auction on

23  March 27th.  That's docket number 566.  I think that's all.

24          And we did do -- submit a declaration from Lori

25  Alvarez, and she is here as well.  A-L-V-A-R-E-S -- Z, I'm

4

1    sorry.  Docket number 580.  And attached to our reply was

2    the -- is a declaration which is docket number 591, of Chris

3    Houser, H-O-U-S-E-R.  And Mr. Houser is also present.

4          THE COURT:  And that declaration was submitted

5    because of Mr. Blank's and the Debtor's assertion that for

6    some reason Mr. Peplin isn't qualified to live in the -- in

7    the park?

8          MR. ISRAEL:  That's exactly why we submitted it,

9    your Honor.  We actually believe that issue is irrelevant to

10   the --

11         THE COURT:  Well, let me ask you just the

12   question, so maybe we can avoid anything else.  Could I have

13   -- could a total stranger have come and bought the mobile

14   home at the auction and had no intention to live there?

15         MR. ISRAEL:  Yes, your Honor, they --

16         THE COURT:  And they could have -- they could have

17   sublet it?

18         MR. ISRAEL:  Yes, your Honor.  We expressed stated

19   in the sale motion, and that term remains consistent to this

20   day, that the trustee did not assume the ground lease.  It's

21   been rejected.  We are not including the ground lease, and

22   that's not a condition of the sale.  Anybody wishing to have

23   a space there needed to go to the -- to the homeowners

24   association, the park, and apply and qualify.

25         THE COURT:  Very good.  All right.  I just needed

5

1    that clarification, too, that the sale was contingent on

2    anyone being able to live there.

3            MR. ISRAEL:  That's exactly correct.

4            THE COURT:  All right.  Thanks.

5            So, dockets number 539, 560, 578, 566, 580, and

6    the reply declaration of Mr. Houser under five -- that's

7    docket number 591, the Court has received those.

8            MR. ISRAEL:  And there may be one more that I

9    missed.  I'm sorry, your Honor.  Five-seventy-seven?

10           UNIDENTIFIED SPEAKER:  Yes.

11           MR. ISRAEL:  Yes.  There was a supplemental --

12   there was a second declaration from Greg Peplin, P-E-P-L-I-

13   N.  I apologize.  I thought there might have been.  Thank

14   you.  Five-seven-seven is the docket number.

15           THE COURT:  Okay.  And the Court has received that

16   one, too.

17           MR. ISRAEL:  Okay.

18           THE COURT:  And you're suggesting that you don't

19   want to add any further examination of your own -- or the

20   body of these witnesses?

21           MR. ISRAEL:  Not on direct, no.

22           THE COURT:  Okay.

23           Mr. Blank, would you like to call anyone and

24   cross-examine any of these declarants?

25           MR. BLANK:  I'd like to clarify just one issue

*Briggs Reporting Company, Inc.*

6

1  that the Court brought up.  And that is that whether or not

2  Mr. Peplin qualifies as a lessee is important, not whether

3  he --

4          THE COURT:  Well, let me -- I'm sorry.  Let me

5  make sure -- I think you're going right in the right

6  direction.  You're saying that you have to have a lease to

7  live there?

8          MR. BLANK:  No, you have to have a lease in order

9  to be able to plop a mobile home there.

10          THE COURT:  Question.  When was the last time your

11  client has a lease?

12          MR. BLANK:  Yeah.  She does not have one.

13          THE COURT:  Did he ever have a lease?

14          MR. BLANK:  No.

15          THE COURT:  Okay.  I understand your

16  clarification.

17          MR. BLANK:  Okay.  So, I think it is pertinent

18  whether or not Mr. Peplin could qualify as a lessee.

19          THE COURT:  Well, you've already briefed that.

20  I'll get to that conclusion.  Would you like to call a

21  witness?

22          MR. BLANK:  None on behalf of our assertion that

23  this should not be treated --

24          THE COURT:  This is a 363(m) finding evidentiary

25  hearing.

7

1          MR. BLANK:  Exactly.

2          THE COURT:  The Court has evidence before it with

3  respect to the proponents of a 363(m) finding.  Would you

4  like to challenge that?

5          MR. BLANK:  So, I don't think so.

6          THE COURT:  Thank you.

7          MR. BLANK:  I mean, I think that --

8          THE COURT:  that's all we're doing here -- that's

9  all we're doing here is an evidentiary hearing on the

10  findings of 363(m).  I'll give you another opportunity.

11          MR. BLANK:  Thank you, your Honor.  In my papers

12  and orally I have asserted that the evidence presently

13  before the Court does not qualify to satisfy the 363(m)

14  requirements.

15          THE COURT:  Would you like me to tell you what the

16  Ninth Circuit has said the requirements are?

17          MR. BLANK:  Well, I'd like the Court to make a

18  decision.

19          THE COURT:  Well, I will.

20          MR. BLANK:  And as long as the Court

21  understands --

22          THE COURT:  I'll make a decision.

23          MR. BLANK:  -- my argument --

24          THE COURT:  Mr. Blank, you brought us all here

25  today so that you could --

*Briggs Reporting Company, Inc.*

8

1          MR. BLANK:  I did not.

2          THE COURT:  No --

3          MR. BLANK:  You brought us all here today.

4          THE COURT:  No, sir.  No, sir.  You said at the

5 hearing, I want to present evidence with respect to a 363(m)

6 finding.  You said that on May -- on March 27th.

7          MR. BLANK:  I did not, your Honor.

8          THE COURT:  Okay.  Let's say I'm wrong.  Is there

9 anything you'd like to add?

10          MR. BLANK:  Your Honor, if I may.  I think one of

11 the most important things that the Court said on March 27th

12 was, I don't need to win the argument, I'm the Judge.  I

13 make the decision.

14          THE COURT:  That's right.

15          MR. BLANK:  I think that's very important to keep

16 in mind, and all I want is for the Court to make the correct

17 decision.

18          THE COURT:  I'd like -- I am sure you do.  Now the

19 question is, do you have anything here for the Court to

20 consider with respect to the evidence under 363(m)?

21          MR. BLANK:  I have no further evidence to submit.

22 I've made the point that I wanted to make with respect to

23 whether Mr. Peplin qualifies as a lessee.  Not as a tenant,

24 not as an occupant, but as a lessee.

25          THE COURT:  Now let me ask you this.

9

1          MR. BLANK:  And as long as the Court understands

2     that argument, then I think I'm -- done what I can.

3          THE COURT:  That's perfect.  Have a seat.

4          MR. BLANK:  Thank you, your Honor.

5          THE COURT:  Do you have anything else, Mr. Israel?

6     Would you like to address anything that's been said by Mr.

7     Blank?

8          MR. ISRAEL:  Your Honor, the trustee believes that

9     he has submitted ample evidence, much more than usual, for a

10    good-faith-purchaser finding.

11         The fact that -- for whatever it was, two or three

12    weeks, there was a dual agency not involving the trustee or

13    the trustee's broker, was -- was in the past.  It was for a

14    brief time.  This property was marketed since October until

15    now, that's almost six months.  It remains in the Multiple

16    Listing Service, saying that it's active subject to court

17    approval.

18         THE COURT:  Would you like to explain how you

19    resolved the problem of -- the alleged problem of the dual

20    representation?

21         MR. ISRAEL:  Yes, your Honor.  Upon discovering it

22    -- and again, let me back up just one moment.  This arose

23    from the overbid.  So it was not anything that was in

24    existence when we filed the sale motion.

25         THE COURT:  What do -- excuse me.  Wasn't in

10

1  existence?

2          MR. ISRAEL:  Well there was no dual representation

3  of anybody at the time we filed the sale motion for the

4  stalking horse buyer, Galaxy Homes.

5          THE COURT:  So you're suggesting that the -- now

6  understand something else, that maybe you missed this.  But

7  I vacated that entire auction.  That auction is void ab

8  initio.  It's as if it never existed.  And I did that, as I

9  put in my order, out of an abundance of caution, because I

10 am the first proponent of transparency with respect to

11 auctions in this courtroom.

12         I don't want a situation, an Alex Jones type

13 situation.  I don't want anything like that because it just

14 costs more money.  So, I vacated that entire auction, even

15 though it was on the edge of doing it or not, because Mr.

16 Blank raised an appropriate objection, and I then said,

17 okay, we'll do it again, and we did it.

18         And now, explain to me, was there ever a

19 representation by a broker for the stalking horse bidder?

20         MR. ISRAEL:  There -- for the stalking horse

21 bidder, my understanding is there was nothing in writing.

22 We -- this is --

23         THE COURT:  Forget that.

24         MR. ISRAEL:  I'm sorry.

25         THE COURT:  Forget -- a handshake?

11

1          MR. ISRAEL:  Yeah.  There was briefly.

2          THE COURT:  Okay.  So, you know, let's not get

3 technical here.

4          MR. ISRAEL:  It was for -- it was for a period of

5 two or three weeks.  When the trustee was advised of it, we

6 immediately disclosed it to the Court.  Your Honor vacated

7 the --

8          THE COURT:  So the answer is, yes, there was a --

9          MR. ISRAEL:  Yes.

10         THE COURT:  -- at least a handshake

11 representation?

12         MR. ISRAEL:  There was.

13         THE COURT:  Yes.  Okay.

14         MR. ISRAEL:  That's my understanding.

15         THE COURT:  That's fine.  And now was there a

16 representation of the overbidder?

17         MR. ISRAEL:  There was when the first -- the

18 original overbid came in, and Mr. Peplin, after the Court's

19 order vacating the first auction, replaced Galaxy with Ms.

20 Alvarez, who is present again.

21         THE COURT:  Has there been any evidence presented

22 today of any collusion?

23         MR. ISRAEL:  No, your Honor.

24         THE COURT:  Has there been any evidence presented

25 of any -- any devious behavior between the original bidder,

12

1  the stalking bidder and the overbidder?

2          MR. ISRAEL:  No, your Honor.

3          THE COURT:  Okay.  The overbidder at the new

4  auction, that was still the overbidder, correct?

5          MR. ISRAEL:  Yes, for the same price.

6          THE COURT:  Because the original bid was in place

7  still?

8          MR. ISRAEL:  Yes.

9          THE COURT:  Okay.  So, there was competitive

10  bidding at the second auction?

11          MR. ISRAEL:  There was an overbid, yes.

12          THE COURT:  Yeah, it was competitive?

13          MR. ISRAEL:  Yes.

14          THE COURT:  Okay.  If it wasn't competitive, the

15  stalking horse bidder would have won?

16          MR. ISRAEL:  Yes.

17          THE COURT:  Okay.  And have you seen any evidence

18  presented to the Court that any actions taken by any party

19  involved in the auction was untoward?

20          MR. ISRAEL:  No, your Honor.

21          THE COURT:  Collusive?

22          MR. ISRAEL:  Nothing at all.

23          THE COURT:  Rigged?

24          MR. ISRAEL:  Nothing at all.

25          THE COURT:  Okay.

13

1           MR. ISRAEL:  I would not be part of something like

2    that, your Honor.  And I --

3           THE COURT:  Well, and I wouldn't allow it to

4    happen.  Thank you very much for all of your help.

5           MR. ISRAEL:  Thank you, your Honor.

6           THE COURT:  All right.  I'll take everything under

7    submission and I appreciate --

8           MR. BLANK:  Your Honor, if I may, I'd like to at

9    least respond to the arguments that were made in the reply.

10          THE COURT:  Sure.  Go ahead.

11          MR. BLANK:  Okay.  Thank you, your Honor.

12          Due process is important to your Honor, and the

13   opportunity to be heard is the sine qua non of due process.

14   So there are several arguments that were made in the reply

15   that make no sense at all.

16          Let's start with the one where the trustee argues

17   that once Mr. Peplin supposedly fired Mr. Guarino, that no

18   longer was there a fiduciary duty owed.  The support for

19   that argument is in a trial court decision on a question of

20   dischargeability of debt having to do with fiduciary duties

21   of real estate brokers.  And the holding was that the broker

22   in that case was not acting as a broker with respect to the

23   debt that was argued to be non-dischargeable.  And that has

24   nothing to do with whether or not Mr. Guarino and his

25   employer, Galaxy, who happened to be the stalking horse

14

1  bidder, continued to have a fiduciary obligation not to harm

2  Mr. Peplin.

3          Now I want to be clear.  I'm not suggesting that

4  Mr. Peplin is a bad guy.

5          THE COURT:  Did you -- are you suggesting that you

6  have evidence that there was a breach of fiduciary duty?

7          MR. BLANK:  I think that there wasn't because --

8          THE COURT:  Excuse me.  It's a -- listen to my

9  question carefully.  Do you have any evidence that there was

10  a breach of fiduciary duty by anybody alleged to be a

11  broker?

12          MR. BLANK:  That's an impertinent question, your

13  Honor.

14          THE COURT:  "Impertinent"?

15          MR. BLANK:  Impertinent.  Irrelevant to the

16  question before the Court.

17          THE COURT:  Am I being impertinent to you?

18  Because if it is, I apologize.  I would -- never would be

19  impertinent to you.

20          MR. BLANK:  You have been impertinent to me on

21  numerous occasions, your Honor.

22          THE COURT:  Well, you're going to do this.  Okay.

23  Go ahead.

24          MR. BLANK:  Your Honor, if I may.  The question

25  isn't whether there was a breach of fiduciary duty.  The

15

1  question is, whether it would have been a breach of

2  fiduciary duty for Galaxy to try to overbid Mr. Peplin, and

3  it would have been, which is perhaps the reason that Galaxy

4  chose not to show up at the second auction.

5       So when the Court says there was competitive

6  bidding, that's a fantasy.  There was not competitive

7  bidding.  What happened was, the other bidder chose not to

8  participate.  And it's my contention that they chose not to

9  participate because they had previously been hired by the

10  overbidder.

11      I'm not suggesting that Mr. Peplin's a bad person.

12  I'm not suggesting that he intended to collude or corrupt

13  the process.  But the fact is, when he hired Galaxy to be

14  his broker, they became obligated not to harm him, and that

15  obligation didn't expire because the Court ab initio vacated

16  the first auction.

17      So the question or whether they violated their

18  fiduciary duty is impertinent.  The question is whether they

19  still had a fiduciary duty and whether that affected the

20  sale process.  And our contention is that it did.  It did

21  because it would have been a breach of that duty for them to

22  overbid Mr. Peplin.

23      I will note for the record that they're not here.

24  They weren't here on the 27th, and they're not here now.

25  And even though --

16

1          THE COURT:  I'm sorry.  Who are --

2          MR. BLANK:  -- the trustee --

3          THE COURT:  -- who are "they"?  I don't know --

4          MR. BLANK:  Galaxy.

5          THE COURT:  -- who you're talking about.

6          MR. BLANK:  Galaxy.

7          THE COURT:  "Galaxy."

8          MR. BLANK:  Mr. Guarino, Mr. Herr.

9          THE COURT:  Okay.  I just don't understand what
10 you're saying, that's all.  I wanted you to clarify when you
11 use the pronoun, "they."

12          MR. BLANK:  Happy to do that.  I really do want to
13 assist the Court in making the best --

14          THE COURT:  Well, if you would quit interrupting
15 me while I ask you questions, maybe we could get there.

16          who are you referring to when you say, "they
17 aren't here"?

18          MR. BLANK:  Galaxy, Mr. Herr, Mr. Guarino.

19          THE COURT:  Why do they need to be here?  This is
20 a 363(m) finding with respect to the buyer, the successful
21 purchaser at the auction.

22          MR. BLANK:  The trustee's argument is that they
23 could have overbid.  That they were free to overbid.  That
24 they were not bound by a fiduciary --

25          THE COURT:  You can overbid the overbidder.

17

1          MR. BLANK:  Exactly.

2          THE COURT:  Yes, they could have.

3          MR. BLANK:  "They could have."  That's what his

4    argument is.  I'd like them to be here so that I could

5    examine them about whether they felt constrained or not

6    constrained to overbid, but they're not here.  So, fine.

7          My contention is that as a matter of law, they

8    were prohibited from trying to overbid Mr. Peplin.  And, in

9    fact --

10          THE COURT:  They were -- I'm sorry.  I'm sorry.

11          MR. BLANK:  -- they did not.

12          THE COURT:  Let me -- I'm trying to understand

13    your -- they were prevented from overbidding?

14          MR. BLANK:  Prohibited.

15          THE COURT:  Who prevented them?

16          MR. BLANK:  Their fiduciary duty prevented them,

17    prohibited them from overbidding Mr. Peplin.

18          THE COURT:  Okay.  You know this has been resolved

19    by the Fifth Circuit?

20          MR. BLANK:  I do not.

21          THE COURT:  Okay.  You'll see.

22          MR. BLANK:  Fair enough.  I'm always willing to be

23    educated, your Honor.

24          My contention, unrebutted by any authority that

25    makes any sense, from the Fifth Circuit or elsewhere, is

18

1  that they had a fiduciary duty as his broker not to harm

2  him.  And it would have harmed him for them to bid it up.

3           THE COURT:  Would they have made more money?

4           MR. BLANK:  I don't know.

5           THE COURT:  Would they have made more money if the

6  bidding had gone up?

7           MR. BLANK:  I don't know.

8           THE COURT:  Well, think about it for a second.

9  They weren't the brokers of Mr. Peplin, right?

10          MR. BLANK:  We have Mr. Peplin's --

11          THE COURT:  Excuse me.  They --

12          MR. BLANK:  -- testimony.

13          THE COURT:  -- they weren't the brokers at the

14 time of the second auction of Mr. Peplin, correct?

15          MR. BLANK:  That's unclear, your Honor.  It's

16 unclear --

17          THE COURT:  Well, what you do mean, it's unclear?

18          MR. BLANK:  -- because we don't have a declaration

19 from them --

20          THE COURT:  That's what this --

21          MR. BLANK:  -- that said that --

22          THE COURT:  -- that's what this hearing's about.

23          MR. BLANK:  And they haven't testified about

24 whether they were properly terminated or not, or whether

25 they will --

19

1           THE COURT:  Okay.

2           MR. BLANK:  -- assert that they procured a

3   willing, able buyer, okay, and that they're still entitled

4   to a commission.  We don't know.

5           THE COURT:  Mr. Israel, is there anybody here that

6   can testify to this?

7           MR. ISRAEL:  Yes.  Mr. Peplin in his declaration,

8   where he says that he replaced Galaxy with Ms. Alvarez, who

9   is also here.

10          THE COURT:  Would you like to cross-examine him?

11          MR. BLANK:  I understand what his testimony is,

12  and to me it's unclear.

13          THE COURT:  Yes.  Would you like to cross-examine

14  him?  I'm giving you an opportunity to cross-examine anybody

15  here in the room.

16          MR. BLANK:  Sure.  Let's put Mr. Peplin on the

17  stand.

18          THE COURT:  Please.

19          MR. ISRAEL:  In the chair (indiscernible), right?

20          THE COURT:  Yes.

21          MR. ISRAEL:  Are we --

22          THE COURT:  Please swear him in.

23          THE CLERK:  Yes, your Honor.

24          Raise from the seat.  Please raise your right hand

25  to be sworn.

20

1          GREGORY PEPLIN - WITNESS - SWORN

2          THE WITNESS:  I do.

3          THE CLERK:  Please state your name for the record.

4          THE WITNESS:  Greg Peplin.

5          THE CLERK:  Okay.  And spell your last name,

6 please.

7          THE WITNESS:  P-E-P-L-I-N.

8          THE CLERK:  Thank you.

9          THE COURT:  Good morning, Mr. Peplin.

10          THE WITNESS:  Good morning.

11          THE COURT:  Mr. Blank wants to ask you some

12 questions.

13                    CROSS EXAMINATION

14 BY MR. BLANK:

15 Q    Good morning, Mr. Peplin.

16 A    Morning.

17 Q    Have you ever told Galaxy, Mr. Guarino, Mr. Herr, that

18 they were free to overbid you?

19 A    Not specifically.

20 Q    Have they ever sent you anything orally, in writing or

21 otherwise that says, we waive any right to any commission

22 that we might have earned by representing you in this

23 particular sale?

24 A    No.

25          MR. BLANK:  Good enough, your Honor.

21

1          THE COURT:  Good enough.  Thank you very much.

2          Mr. Israel, would you like to ask him any

3  questions?

4          MR. ISRAEL:  Yes.

5                    REDIRECT EXAMINATION

6  BY MR. ISRAEL:

7  Q    Mr. Peplin, did you have a conversation with David

8  Guarino of Galaxy and advise him -- first I'll ask orally,

9  that he was no longer your broker?

10          MR. BLANK:  Objection, hearsay.

11          THE COURT:  No.  He's asking him if he ever had

12  the conversation, not what the response was.

13          THE WITNESS:  I had that conversation.

14  BY MR. ISRAEL:

15  Q    And you told him what he was no longer your broker?

16  A    Correct.

17          MR. BLANK:  Objection, hearsay.

18          THE COURT:  Well, who -- Mr. Blank, the question

19  is, did he say it.

20          MR. BLANK:  It is.

21          THE COURT:  Yeah.  Well, it's not hearsay.

22          MR. BLANK:  Out of court.

23          THE COURT:  Let me ask you the question.  Did --

24  is that a correct statement from you about you, you made

25  that statement?

22

1          THE WITNESS:  Correct.

2          THE COURT:  Nobody else made that statement?

3          THE WITNESS:  Right.

4          THE COURT:  It's not hearsay.

5          MR. BLANK:  It is, your Honor, but that's all

6   right.

7          THE COURT:  What do you mean it is all right?

8          MR. BLANK:  The Court's going to rule the way it

9   rules.  I understand.

10          THE COURT:  That's how every court does.  Every

11  court rules the way it's going to rule.  I'm moving --

12          MR. BLANK:  He's no more qualified to testify

13  about his out-of-court statements than he is to testify

14  about --

15          THE COURT:  You called him.

16          MR. BLANK:  -- somebody else's out-of-court

17  statements.

18          THE COURT:  Excuse me.  You called him.  And its

19  present -- its present -- there are plenty of exceptions.

20  This is now becoming a little bit disturbing.

21          Mr. Israel, do you have any more questions for

22  this gentleman?

23          MR. ISRAEL:  I --

24          THE COURT:  It's overruled.

25          MR. ISRAEL:  -- I do not, your Honor.

23

1          THE COURT:  Thank you very much.  You're excused.

2          All right.  I'll take this under submission.  have

3   a good day, everyone.

4          MR. ISRAEL:  Thank you very much, your Honor.

5          MR. BLANK:  Your Honor, for the record, I was not

6   finished with my argument.

7          THE COURT:  Would you like to call any other

8   witnesses?

9          MR. BLANK:  No, your Honor.

10         THE COURT:  Okay.

11         MR. BLANK:  Another argument that was made by the

12  trustee in his reply brief is that my client has no standing

13  to even object to the good-faith finding --

14         THE COURT:  That's overruled.

15         MR. BLANK:  Fair enough.  Thank you, your Honor.

16         THE COURT:  Anything else?

17         MR. BLANK:  Now we're done.

18         THE COURT:  Okay.

19         MR. ISRAEL:  Thank you again, your Honor.

20         THE COURT:  Court is adjourned.

21      (Proceedings concluded.)

22

23

24

25

24

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/ Holly Steinhauer_____        5-20-25_____
     Transcriber                       Date
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*